h CARAWAY, J.
The surviving spouse and children of an electrocution victim appeal the trial court’s allocation of fault among the victim and the municipality which provided the electrical utility. The defendant answers the appeal, urging that La. R.S. 9:2800.10 should apply retroactively to absolve its liability because of the decedent’s alleged criminal conduct at the time of his death. The defendant also asserts that the award for damages was abusively high. For the following reasons, we affirm.

Facts and Procedural History

Johnny T. Street (“Street”) was electrocuted at Louisiana Pacific Corp. (“LP”)’s paper mill on January 8, 1995, after climbing up the plant’s electrical substation with a ladder to allegedly salvage copper wire. Street worked at the Winnfield mill for more than twenty years. He operated heavy equipment used for moving logs from the front of the mill to the old plywood plant at the back. The plywood plant fell into disuse before LP purchased the mill and was used only for storing logs. Some years earlier, when the plywood plant was operational, a subcontractor constructed the electrical substation to service the plywood plant.
The City of Winnfield (“City”) operates its own electric utility and owns the electric distribution lines that feed into the three-phase substation. In 1992, the May- or of Winnfield called the plant manager and told him the City wanted the transformers from the substation, as they were no longer needed to service the unused plywood plant. The plant manager told the mayor it was okay to send a crew for them. The mayor instructed the public | j>works superintendent to retrieve the transformers, who in turn dispatched a five man crew to do the job.
The substation had been protected by a fence with warning signs (“Danger High Voltage” “Danger Keep Out”) and a locked gate. It was established at trial that the fence was in place when the City’s crew arrived to disconnect the transformers. In addition to taking the transformers, the crew also took the fence and the warning signs, thereby exposing the entire substation structure. The plaintiffs’ evidence showed that even without the transformers, the substation was not disabled because the switches remained. The City’s work crew did not de-energize the 13,800 volt line leading to the substation; neither did LP request that the City de-energize the line. The electrical line leading from the substation to the plywood plant was *454 de-energized after the removal of the transformers.
About a year later, in September, 1993, the plywood plant burned to the ground in a three day long fire. Thereafter, LP employees began a company-directed salvaging operation for the plant rubble. LP sold the salvageable material'to a scrap metal company. The electrical line from the substation to the plant was removed. The salvaging operations were completed several months before the accident.
On Sunday morning, January 8, 1995, Street drove to the mill and parked his truck near the guard shack in front. LP’s security guard testified that seeing Street at the mill on Sunday was not unusual, and that other employees went by the plant on weekends. After they exchanged a few words, the guard left to make his rounds. When he returned, Street’s truck |3was gone. He did not know whether Street was elsewhere on the mill property, but noted that since the fire, the back part of the property including the old plywood plant and substation was locked up.
Early that afternoon, the utility crew lineman investigating a power outage in a neighborhood near the plant discovered Street’s body hanging from the substation supports. The autopsy report indicated the cause of death as electrocution, noting “extensive burning of the left lateral chest and axillary area extending down on to the left abdomen, bilateral groin area and right upper leg in a diagonal fashion,” “burn like changes circumferentially about the waist,” and “a deep transverse burn like area on the lower aspect of the anteri- or left upper leg.” A videotape introduced as evidence revealed that Street had placed a ladder against the substation, and that bolt cutters and work gloves were lying on the ground. The video also showed the position of Street’s body after he was electrocuted approximately eleven feet above the ground. The substation is shown in the picture which is an Appendix to this opinion.
Street’s surviving spouse, Patricia Johnson Street (“Mrs.Street”), was his second wife. They were married in 1989. His previous marriage ended in divorce. Seven of Street’s nine biological children and Mrs. Street instituted suit against LP and the City. Shortly thereafter, the eighth child also filed suit, and the two proceedings were consolidated for trial. The remaining child never filed suit. One plaintiff claiming to be Street’s child was dismissed from the first suit after DNA evidence excluded Street as a candidate for paternity.
|4Mrs. Street testified concerning her husband’s salvaging of metal from the plant:
Q.... Did Mr. Street tell you what he was — he had planned to do that day after you left [for Sunday School]?
A. No, he wasn’t decided on what he was going to do.
Q. Okay. We know that he went to the LP yard—
A. Yes.
Q. —And that’s where this accident happened. Had he ever gone down to the LP yard on Sundays before?
A. Yes.
Q. And what would he go down there for?
A. Clean his machines.
Q. Would he ever go down there when he was off work just to visit with some of the other employees down there?
A. Yes.
Q. Were you aware before this accident, or was there any time that he *455 ever scavenged or salvaged wire, that sort of thing?
A. Yes.
Q. Okay. When he had last — how were you aware that he had done that in the past?
A. Because I had gone with him when he — he would bring it home and strip it down, and then he’d take it to Alexandria Iron in Alexandria.
* * *
Q. How many times before this accident had he come home with wire from Louisiana Pacific?
A. Three other occasions that I can remember.
* * *
Q. Do you know how much money he got for the wire for the three previous times?
A. I can estimate — a couple of times. I remember one time it was about five hundred and something, and two times, seven hundred.
Q. Each time?
A. Yes. And the last time that he — that he got it was, I think it was nine or something that like that.
Plaintiffs alleged that Street was salvaging metal from the abandoned electrical substation on LP property, and that LP and the City’s negligence in failing to de-energize the high voltage fine created an unreasonably dangerous situation. L.P.’s plant manager testified that employees were not authorized to salvage any material from the company’s property.
| ¡At trial, LP’s plant manager and the City’s director of public works both testified that they did not know there was still “live” wire and that the substation was still energized. Plaintiffs’ electrical engineering experts testified as to numerous violations of the NESC,[1] including the enclosure provision requiring a seven foot fence, warning signs and a lock; the idle equipment safety provision requiring routine inspections and maintenance; the provision for maintaining barriers around climbable structures to inhibit climbing; the provision requiring tree-trimming (vines were growing on the structure which could have conducted electricity); and the vertical clearance rule.[2]
After a three day bench trial, the trial court rendered lengthy written reasons for judgment. The trial court found that LP owned, possessed, controlled and had custody and garde of the electrical tower at the time of the accident and failed in its duty to prevent the existence of an unreasonably dangerous condition. Further, LP had a duty to control and maintain all safety aspects of the transformer station. It therefore failed in its duties to have and maintain a safe design and structure, to supervise changes in the structure, to maintain the transformer station either in proper working order or in proper working order out of use, and to perform regular maintenance and inspections of the structure or the transformer station.
As for the City, the trial court found that its removal activity at the substation constituted substandard conduct. By removing the transformers, | fifence, locks and warning signs, it changed the design of the substation. Moreover, it had a legal duty to de-energize the line and leave the prem *456 ises safe for the public at large: The trial court found that LP and the City’s substandard conduct were contributing causes in fact of Street’s death.
The' trial court found that Street’s substandard conduct was the proximate cause of his death. The court found that “Johnny Street was a competent person. He was a heavy equipment operator for Louisiana Pacific Corporation and had been employed in the pursuit of his occupation for many years. He had the capacity to appreciate the dangers of electricity and in fact had advised one of his children of the dangers of working around electrical wires.”
The trial court emphasized that Street’s death was the result of an intentional and criminal attempt to take the property of another without consent. The court stated:
The circumstances of his activities prevented him from conducting these activities in a safe manner. He could not approach the manager of the premises or anyone in the electrical department to determine if the line was hot or de-energized.... The court finds that Johnny Street was fully aware of the danger involved and disregarded reasonable safety precautions.
The trial court analyzed the comparative fault of the parties and allocated 5% to the City, 5% to LP and 90% to Street, reducing the damage awards as follows:
' N; 7Plaintiffs ^ame Damages for Loss of Support General Damages Total Damages City of Winnfield’s 5% share
Patricia Street $171,910.00 $175.000.00 $350,266.00[3] $17.513.30
LaTonya Coleman $ 12,246.00 $100,000.00 $112,246.00 $ 5,612.30
Phillip Rainwater $ 4.152.00 $100,000.00 $104,152.00 $ 5,207.60
Carlandous Dunlap $ 19,373.00 $100,000.00 $109,373.00 $ 5,968.65
Cornelius Street $ 3,094.00 $100,000.00 $103,094.00 $ 5,154.70
Dennis Street $ 75,000.00 $ 75,000.00 $ 3,750.00
Christina Street $ 75,000.00 $ 75,000.00 $ 3.750.00
Anthony Rainwater $ 75,000.00 $ 75,000.00 $ 3,750.00
Cheryl Harden $ 75,000.00 $ 75,000.00 $ 3,750.00
Total Award $ 1,079,131 $54,456.55
The plaintiffs appealed the judgment, assigning as error the trial court’s allocation of fault. The City answered the appeal, arguing that the trial court erred by failing to apply retroactively the provisions of the immunity statute, La. R.S. 9:2800.10. The City also contests the awards for general damages and loss of support.
1 aDiscussion

Statutory Immunity

The City argues that the trial court erred when it found that La. R.S. 9:2800.10 *457 was substantive and as such, did not apply retroactively. The statute provides as follows:
A. No person shall be liable for damages for injury, death, or loss sustained by a perpetrator of a felony offense during the commission of the offense or while fleeing the scene of the offense.
B. The provisions of this Section shall apply regardless of whether the injury, death, or loss was caused by an intentional or unintentional act or omission or a condition of property or a building. However, the provisions of this Section shall not apply if injury to or death of a perpetrator results from an intentional act involving the use of excessive force.
C. For purposes of this Section “damages” includes all general and special damages which may be recoverable for personal injury, death, or loss of or damage to property, including those otherwise recoverable in a survival or wrongful death action.
The statute was enacted by Acts 1996, 1st Ex.Sess., No. 46, § 1 over a year after the accident. For the purpose of addressing the retroactivity issue, we assume arguen-do that the evidence was sufficient to show that Street was a perpetrator of a felony.
La. Civ.Code art. 6 provides:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
As explained in Bourgeois v. A.P. Green Indus., Inc., 2000-1528 (La.4/3/01), 783 So.2d 1251, Article 6 requires a two-fold inquiry:
First, we must ascertain whether in the enactment the legislature expressed its intent regarding retroactive or prospective application. If the legislature did
so, our inquiry is at an end. If the legislature did 19not, we must classify the enactment as substantive, procedural or interpretive.
The principle contained in La. C.C. art. 6, however, has constitutional implications under the Due Process and Contract Clauses of both the United States and Louisiana Constitutions, such that even where the legislature has expressed its intent to give a law retroactive effect, that law may not be applied retroactively if it would impair contractual obligations or disturb vested rights.
Bourgeois, 783 So.2d 1251, 1257, citations omitted.
Substantive laws are laws that impose new duties, obligations or responsibilities upon parties, or laws that establish new rules, rights and duties or change existing ones. Sudwischer v. Estate of Hoffpauir, 97-0785 (La.12/12/97), 705 So.2d 724; Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14. Interpretive laws are those which clarify the meaning of a statute and are deemed to relate back to the time that the law was originally enacted. Id. Procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of the laws. Id.
La. R.S. 9:2800.10 established conditional immunity from liability for injury, death or loss sustained by perpetrators of felonies while committing the offense or while fleeing the scene of the offense, thereby altering legal duties owed from one person to another, as established under our codal scheme. See La. C.C. art. 2315, et seq. This change affected existing rights of persons having a cause of action in tort under Louisiana’s comparative fault regime. Thus, we find that Act 46 is substantive. Because appellants’ cause of action arose before the statute’s effective date, we agree with the trial court’s deci *458 sion that the new law cannot be applied retroactively.

jjnAllocation of Fault

It is well settled that the allocation of fault is a factual matter within the sound discretion of the trier of fact and will not be disturbed on appeal in the absence of manifest error. Petre v. State, Dep’t of Transp. & Dev., 2001-0876 (La.4/3/02), 817 So.2d 1107; Adams v. Parish of East Baton Rouge, 2000-0424 (La. App. 1 Cir. 11/14/01), 804 So.2d 679; writ denied, 2002-0448 (La.4/19/02), 813 So.2d 1090. The issue to be resolved is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Stobart v. State, Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993). The reviewing court must give great weight to factual conclusions of the trier of fact; where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are reasonable. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985) (citing Canter v. Koehring, 283 So.2d 716 (La.1973)). If an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but then only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court’s discretion. Adams, supra.
In the Watson case, the Louisiana Supreme Court first enunciated and reviewed the criteria for apportionment of fault. This court reviewed that decision in Daye v. General Motors Corp., 29, 118 (La.App. 2 Cir. 5/21/97), 712 So.2d 120, 129; rev’d on other grounds, 97-1653 (La.9/9/98), 720 So.2d 654, as follows:
In Watson, the plaintiffs brought a wrongful death action against the father of a twelve-year-old boy for the accidental shooting death of Mr. Watson while the boy was deer hunting on the Watson farm. In the twilight of late afternoon, the boy, who had never been taught how to use the weapon or its scope, mistook Mr. Watson for a deer and fired a single fatal shot, striking Mr. Watson in the head and killing him instantly. A jury found that Mr. Watson was 100 percent at ,fault for failing to wear “hunter orange,” which was a violation of LSA R.S. 56:143.
The supreme court reversed, holding that it was clearly wrong for both of the lower courts to have determined that the victim, Mr. Watson, was the sole party at fault in his own death. The high court apportioned the decedent with 20% fault, and the father and son with 80% of the fault of the accident.
In reaching this conclusion, the court set guidelines for apportioning fault. Quoting the Uniform Comparative Fault Act, 2(b) and Comment, the court stated:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
Watson, supra at 974. (Emphasis ours). We add emphasis to point out the two-pronged nature of the inquiry. The now well-recognized Watson factors used in one prong to assess the nature of the conduct that may influence the degree of fault assigned, were stated as follows:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger,
(2) how great a risk was created by the conduct,
*459 (3) the significance of what was sought by the conduct,
(4) the capacities of the actor, wheth-* er superior or inferior, and
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
With respect to the other prong, the causal relationship between the negligent conduct and the harm, the court further stated that [i2“the relationship between the fault/negligent conduct and the harm to the plaintiff,” “as evidenced by concepts such as last clear chance,” “are considerations in determining the relative fault of the parties.” Watson, supra at 974. After examining the action of the boy in firing the weapon, and the action of Mr. Watson in inadvertently walking unannounced at a distance of 461 feet from the boy’s location, the court concluded that Watson’s “omissions, at worse, had only an indirect causative impact” while the action of firing the gun or failing to train and supervise the firing of such weapon “had a direct potential for fatal consequences.” Id. at 974.
Except for the City’s argument concerning the immunity statute, neither side questions the trial court’s findings of fault on the part of both the City and Street. The combined fault of the City and LP resulted in the protective fence and warning signs being removed from the substation. After the fire destroyed the plant, no electrical wire exited the substation to the plant and vines grew up on the structure. Nevertheless, an electrical wire continued to connect the substation with the main power line, as shown by the photograph in the Appendix. Therefore, plaintiffs cannot argue that Street is free from fault because of a reasonable assumption by Street that the substation was de-ener-gized. The purpose of the substation was to receive and transmit electrical power, and the possibility that electricity still fed into the structure remained apparent.
Using the Watson factors to consider the nature of the parties’ conduct, we do not find that the City’s deviation from the standard of care outweighs Street’s fault. The City’s unexplained removal of the fence three years before the accident and LP’s failure to object and take corrective measures combined into a mix of corporate confusion and carelessness. While such conduct cannot be considered as totally inadvertent, it does not | ^amount to the same level of awareness of the danger by Street, who the trial court found was fully competent to appreciate the danger of the substation. Regarding the risk created by the conduct, the City, as the operator of the electrical utility, created a great risk by negligently managing the substation facility. Nevertheless, since the evidence indicates that Street was not lured onto the structure by the belief that the substation was de-energized, his choice to climb upon the structure, eleven feet above the ground, also created a great risk. Regarding the capacities of the actors, the City and LP were in the superior position and were charged with the significant duty to guard against the possibility of electrocution. Finally, considering together the significance of what was sought by the conduct and any extenuating circumstances which might require the actor to proceed in haste, we agree that the trial court could reasonably conclude that Street’s unauthorized attempt to remove wire or scrap metal from the substation caused him not to inquire concerning the power feed to the structure.
Finally, regarding the extent of the causal relation between the conduct and the damages, Street’s deliberate choice to encounter the electrical facility had the more “direct potential for fatal conse *460 quences” in a manner similar to the child shooter in Watson. Accordingly, we will not disturb the apportionment of fault, finding that the application of Watson allows for the trial court’s conclusion. Damages
The City argues in its second assignment that the trial court erred in awarding general damages for Street’s eight children, and that the evidence |usubmitted at trial as to each child’s relationship with Street did not support the amounts awarded.
General damages are those which may not be fixed with pecuniary exactitude; instead, they “involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style that cannot be definitely measured in monetary terms. Duncan v. Kansas City Southern Ry. Co., 00-0066 (La.10/80/00), 773 So.2d 670; Craighead v. Preferred Risk Mutual Ins. Co., 33,731 (La.App. 2 Cir. 8/25/00), 769 So.2d 112; writ denied, 00-2946 (La.12/15/00), 777 So.2d 1230; Beasley v. Yokem Toyota, 33,-805 (La.App. 2 Cir. 8/23/00), 767 So.2d 149. In a wrongful death suit, general damages pertain to one’s loss of love and affection. McGrail v. Lee, 35, 756 (La.App. 2 Cir. 4/3/02), 814 So.2d 729. There is no mechanical rule for determining general damages; the facts and circumstances of each case control. Beasley, Id. The discretion vested in the trier of fact is great and even vast, so that an appellate court should rarely disturb an award of general damages. Duncan, supra (citing Youn, supra.). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond 'that which a reasonable trier of fact could assess for the effects of a particular injury to a particular plaintiff under the particular circumstances that the appellate court should | -[ ¡/increase or reduce the award. Duncan, supra; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
In the present case, the trial court awarded $100,000.00 to each of the four minor children and $75,000.00 to each of the four major children. At the time of the accident, the minor children and their respective ages were as follows: Cornelius Street, age 17; Phillip Rainwater, age 16; LaTonya Coleman, age 11; and Carlandous Dunlap, also age 11.
LaTonya’s mother, Leona Coleman, testified that Street had always provided her with support payments for LaTonya, and that Street would keep LaTonya on weekends when she worked. Further, Street would visit LaTonya at her house or take LaTonya with him, fishing or riding, and that he remembered her birthdays.
Cornelius Street’s mother, Annie Goods, testified that Cornelius and his father had a good relationship, which included fishing and camping together, that Street paid monthly child support for Cornelius, and that Street maintained health insurance for him.
Carlandous Dunlap testified by telephone from Dallas, where he lived with his mother, Jean Harris. They moved from Winnfield to Dallas about a year before the trial. Carlandous testified that he stayed with his father every other weekend, that they would play dominoes together, hunt and fish, and that his father remembered his birthday. Carlandous’ mother, Jean, testified at the filiation hearing that Street paid court-ordered monthly child support to her for Carlandous.
*461 lifiPhillip Rainwater testified at trial that his father came to see him just two days before the accident. Phillip’s mother died the year before and Phillip lived with his grandmother. Phillip would spend the night at his father’s house and they would talk on the phone frequently, at least every other day. They fished and hunted together, and observed holidays such as Christmas and Father’s Day. Street attended Phillip’s sports banquets. Street also paid monthly child support for Phillip.
The City argues that LaTonya Coleman, a star athlete for Winnfield Senior High School at the time of trial, has not had “difficulties in school, and was doing fine academically and athletically;” Phillip Rainwater “was able to complete high school and was enrolled in college at the time of trial;” and, Carlandous Dunlap “has never been in any kind of trouble, and was doing fine at the time of trial.” On the other hand, Cornelius Street was incarcerated at the time of trial and has had a history of being suspended from school and getting into trouble, even before his father’s death. We find these arguments unpersuasive with regard to the loss of love and affection which the minor children experienced.
Of the older children, Dennis and Christina Street were both born during Johnny Street’s marriage to his first wife, Zeffer, to whom he was married for more than fifteen years. They were 29 and 28 years old at the time of the accident, and both had lived in Texas since 1987. Dennis lived with his father in Winnfield for a time before moving to Texas, and hunted with him when he was growing up.
|17Anthony Rainwater was Phillip Rainwater’s older brother. He was 23 years old when his father died. Like the other boys, Anthony recalled hunting and fishing with his father. He talked to his father on the telephone frequently. Finally, we have reviewed Cheryl Harden’s testimony concerning the quality of her relationship with her father while she was growing up in Dodson. Cheryl Harden was 19 years old at the time of the accident.
Based upon our review of the record and the testimony of all of these children, we cannot say that the trial court abused its discretion in making these awards for general damages. Accordingly, we find this assignment of error to be without merit.
The City assigns as error the trial court’s acceptance of Dr. Randolph Rice’s expert testimony over that of its expert, Dr. Kenneth Boudreaux, for the purpose of calculating damage awards for appellants’ loss of support. The City argues that because Dr. Rice assumed that Street’s earnings would continue at about the same level and disregarded the fact that LP’s mill completely shut down in 1998, his analysis is flawed. In reply, appellants argue that in spite of the closure of the Winnfield plant, Street, who was 50 years old at the time of his death, had marketable job skills that were transferra-ble to other employment.
The trier of fact is given much discretion in the assessment of damages. La. C.C. art. 2324.1. In addition to loss of love and affection, the elements of damage for wrongful death are loss of services, loss of support, medical expenses and funeral expenses. Scott v. Pyles, 99-1775 (La.App. 1 Cir. 10/25/00), 770 So.2d 492, writ denied, 2000-3222 (La.1/26/01), 782 So.2d 633; Cannon v. Cavalier Corp., 572 So.2d 299 (La.App. 2 Cir.1990). Factors which should be weighed in determining the amount due for loss include the decedent’s present earnings, age and life expectancy, work life expectancy, the possibility of a decrease or increase in earnings, the decedent’s job security, the nature of the decedent’s work, health, relationship with his *462 family, personal expenses and past work record. Other factors are the surviving spouse’s age and health, the minor children’s ages, and the effects of inflation and the need to discount future earnings to a present day amount. In short, all factors relevant to a determination of the amount of the loss of support due to the premature demise of the decedent should be considered. Nigreville v. Federated Rural Elec. Ins. Co., 642 So.2d 216 (La.App. 3 Cir. 1994); unit denied, 94-2803 (La.1/27/95), 649 So.2d 384. However, damages for loss of support cannot be determined with mathematical certainty. Id.
Credibility determinations, including the evaluation of expert testimony, are factual issues to be resolved by the trier of fact. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App. 2 Cir. 12/6/00), 774 So.2d 1093, unit denied, 2001-0026 (La.3/9/01), 786 So.2d 735. Where the testimony conflicts, the fact finder’s reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even where the appellate court may feel that its own evaluations and inferences are more reasonable than those of the jury. Id.
19 In the instant case, and after reviewing the respective experts’ deposition testimony and reports, the trial court accepted Dr. Rice’s analysis and found in written reasons that $25,436 was the correct bench mark income for the purpose of calculating damages for loss of support to Street’s family. We note that the trial court awarded loss of support damages only to the surviving spouse and to the four children who each received separate monthly child support checks from Street. The mothers of these children testified as to the amount of support Street paid. Speculation as to what could have happened to a decedent’s job status after his death is not the proper inquiry. Nevertheless, Street’s job skills and long work history prior to his death were the relevant factors for consideration in determining his work life earning potential which was lost as a result of the accident. From our review of the record, we find that the amounts awarded by the trial court for loss of support are not unreasonable. Accordingly, this assignment is without merit.

Conclusion

For the reasons set forth above, we affirm the ruling of the trial court. Costs of appeal in the amount of $500.00 is assessed to the City pursuant to La. R.S. 13:5112(A), with the balance of appellate costs charged to appellants.
AFFIRMED.
*463 [[Image here]]

. The Institute of Electrical Engineers publishes the "National Electric Safety Code,” setting forth the minimum safety requirements.

. This three phase 13.8 KV line would have required between 14)4 and 18)4 feet of vertical clearance; Street made contact with the line at approximately 11 ¡4 feet.

. Mrs. Street’s award also included $3,356.00 for funeral expenses.