DREW, J.
|/The jury in this medical malpractice action concluded that plaintiffs, Karen Le-Blanc (“Karen”) and her husband, Joe Le-Blanc, had proven the standard of care applicable to defendant Dr. Rezaul Islam, but had not proven, that Dr. Islam breached that standard of care. The trial court granted the LeBlancs’ motion for a judgment notwithstanding the verdict (“JNOV”), rendered judgment in favor of the LeBlancs, and awarded damages. Dr. Islam and the Patient’s Compensation Fund appealed.
We reverse the judgment granting the motion for JNOV and reinstate the jury’s verdict.
FACTS
Dr. Islam, who is board certified in cardiology and internal medicine, practices in the Monroe area. He first examined Karen, who was 52 at the time, on July 26, 2007.' Karen had a poor family history of coronary artery disease, and her mother had been Dr. Islam’s patient.[1] Diabetes was also prevalent in her family.
Káren complained to Dr. Islam of chest pain off and on for a year or so, and that since her mother’s death a month earlier, *284 the chest pain had become more frequent and was going down her left arm and left neck at times. She reported feeling tightness and discomfort in her chest, and that her chest pain had been bad a week earlier.
lidiaren did not have a history of stroke or heart attack, but she did have a pulmonary embolism when she was younger that was probably related to birth control use. She told Dr. Islam that she had had dysli-pidemia, a lipid abnormality, for a year, and had been taking medicine for high blood pressure.
Dr. Islam ordered blood work,[2] and for several tests to be performed on August 16. These tests included an exercise myocardial perfusion study, an echocardio-gram,[3] a nuclear stress test, and a carotid duplex ultrasound.
Dr. Islam went over the test results on August 30. Karen’s chief complaint at the time was chest pain going down her left arm and sometimes her left neck.
Karen’s stress test was positive, which indicated that she had possible heart blockage. Dr. Islam told her that he thought the stress test and echocardio-gram showed that she had a heart attack within the last two years.
The ultrasound suggested • possible blockage in the carotid arteries (“carotids”).[4] The flow in the bilateral vertebral arteries (“vertebráis”) was noted by Dr. Islam to be normal. The carotids provide blood to most of the brain, while the verte-brals provide blood to the cerebellum in the back of the brain.
Because he considered Karen to be a high-risk patient who had already had a heart attack, Dr. Islam wanted to do a left heart catheterization. He also |3thought it was best at the same time to do a carotid angiogram of the carotids and vertebráis to evaluate the blockage in the carotids and to explore the vertebráis for any significant blockage. Whether a carotid angi-ogram also included exploration of the ver-tebráis as a complete study was much disputed at trial.
Karen signed a consent form on August 80 for the procedures which were scheduled to be done on September 6. Checked off under the “Procedures” section of the consent form were “Left Heart Catheteri-zation” and “Carotid angiogram.” Dr. Islam contended that he told Karen that he also wanted to do an angiogram of her vertebráis. Nevertheless, there was no blank for a vertebral ..angiogram on the form, and the blank for “Others” was neither checked nor filled in. The form stated that the physician authorized to perform the procedure had discussed the alternatives and explained thoroughly the need for the procedures and its description with all possible risks and benefits. Stroke was listed as a very uncommon material risk on the form.
The procedures took place as scheduled at Dr. Islam’s office on the morning of September 6, 2007, beginning at 8:48. The carotid angiogram started at 9:13 and ended at 9:24.
*285 The heart cath showed a 100% blockage in the front of her heart, which was what Dr. Islam suspected from the earlier tests. He found 60-70% blockage in a carotid, but the rest of the arteries were okay.
At 10:00, LeBlanc reported feeling nauseous and then vomited, but was fully alert and oriented, and was able to move all limbs. Dr. Islam thought it was most likely she was having an adverse reaction to the dye. She vomited twice more by 11:00, and Phenergan was administered for the vomiting. By |41:00, she was feeling much better and denied any more nausea. She felt sleepy, but not dizzy, had no speech problems, and was alert and oriented. Her neurological exam was again normal, and there was no sign of any cranial nerve impairment. Karen was discharged in stable condition to her sister’s home and to be seen in the morning. Karen and her family were told to call anytime if there was a problem.
Dr. Islam and his staff called her sister’s home that night and also in the morning to inquire about Karen’s well-being. Dr. Islam was told when he called at 9:00 or 9:30 in the morning that Karen had slept well during the night and vomited once. She had thrown up once in the morning and also complained of diplopia. Dr. Islam was concerned, so her told her family to bring her to his office.
Dr. Islam examined Karen immediately upon her arrival at his office and suspected a stroke. He called Dr. Vipul Shelat, a local neurologist, about advice on what to do next. Dr. Shelat, who was out of town, told Dr. Islam to admit Karen to the hospital for a CT scan of the brain and the administration of Lovenox and Plavix.
St. Francis North Hospital called Dr. Islam back and told him that a bed would not be available for Karen until around 3:00 that afternoon. Dr. Islam apprised Dr. Shelat of this development, but was not told to send her to the Emergency Room (“ER”) or to check bed availability at another local hospital.
Dr. Islam told Karen and her husband that they could either wait at his office, or return home and then go to the hospital at 3:00. They chose the latter option.
| sKaren was admitted into St. Francis with a diagnosis of a cerebral .vascular accident, or stroke. Dr. Islam thought she had vertebrobasilar insufficiency based on her symptoms. Dr. Islam’s admit orders stated that Dr. Shelat was to be consulted, and that he was to be asked to see Le-Blanc that day and that he may call Dr. Islam. As per Dr. Shelat’s instruction, Dr. Islam ordered a CT scan of the brain with/without contrast to be done on September 7. He also ordered a MRI of the head in the morning. Dr. Islam wrote on his admission report that Karen would be started on Lovenox.
The radiologist’s impression of the CT scan of her head was a lacunar infarct in the right thalamus that was probably acute or subacute, and a smaller old lacunar infarct in the left thalamus.
The brain MRI the next day showed multiple infarcts involving both thalami and the right cerebellar hemisphere, that were all acute and probably a day or two old.
A magnetic resonance angiogram (“MRA”) of the neck was done on September 10. It showed that the vertebráis were widely patent with no stenosis or occlusion, but there was 40-50% lumen stenosis of the left ICA, thought to be due to arteriosclertoic plaque.
Karen was discharged from St. Francis on September 14 and began the process of inpatient followed by outpatient physical and occupational therapy.

*286
Lawsuit and trial

The LeBlancs contended that Dr. Islam committed medical malpractice when he performed the vertebral angiogram without first obtaining Karen’s informed consent to the procedure, and that he committed medical malpractice |fiin his management of her stroke condition following the procedures on September 6.[5]
After an extensive trial in which the jury heard testimony from the parties, an expert economist, and four medical experts, the jury concluded that the LeBlancs failed to prove that Dr. Islam had breached the standard of care. The LeBlancs filed a motion for JNOV and, in the alternative, a motion for new trial.

JNOV

When granting the motion for JNOV, the trial judge admitted that “this was a highly contested case and the testimony and evidence conflicted greatly on the major issues[.]” However, he found that several material facts pointed so strongly in the LeBlancs’ favor on the issue of breach of the standard of care regarding Karen’s consent to the procedure and Dr. Islam’s management of her stroke that a reasonable person could not have reached a different conclusion.
The trial judge noted that Dr. Islam’s chart notations and records did not mention that he discussed or obtained consent from Karen for the vertebral angiography. In addition, while the consent form referred to alternative procedures, it did not name or detail the alternative procedures and- their advantages or disadvantages. The trial judge concluded that Dr. Islam was obligated under La. R.S. 40:1299.40 to explain the alternative procedures, including the CTA and MRA, and that they carried zero risk of stroke.
The trial judge referred to testimony from the plaintiffs’ two expert witnesses that Dr. Islam had breached the standard of care regarding | informed consent by performing an unnecessary vertebral angi-ogram and in not informing her of the CTA and MRA, which were accepted and safe medical procedures in 2007.
The trial judge also noted that Dr. Islam’s expert witnesses testified that a vertebral angiogram is a separate procedure from a left heart cath and carotid study, that vertebral angiogram was not listed on the consent form, and that Dr. Islam’s records did not show that Dr. Islam informed Karen of the procedure before performing it. The trial judge further noted that while Dr. Islam’s experts disagreed with the LeBlancs’ experts on whether there were breaches of the standard of care, they testified that CTA and MRA were accepted medical procedures in 2007, and that both presented zero risk of stroke. According to the trial judge, the experts for Dr. Islam also testified that they would not have sent LeBlanc home to wait on a hospital bed after she suffered a stroke.
The trial judge noted that Dr. Islam confirmed that the vertebral angiogram was a separate procedure from a carotid study, and that the procedures were billed separately. It was also noted that even though Dr. Islam confirmed that the consent form did not list vertebral angiogram as a procedure that was discussed and consented to by Karen, he also testified that he verbally explained to Karen that he intended to perform a vertebral angio-gram. The trial judge added that not only did the consent form not list CTA and *287 MRA as alternative procedures, but Dr. Islam testified that he did not discuss, explain, or offer the CTA and MRA alternatives to LeBlanc. After reviewing his medical records, Dr. Islam concluded that the vertebral angiogram caused Karen’s strokes.
|sThe trial judge concluded that Dr. Islam violated the standard of care regarding informed consent by failing, among other things, to discuss, explain and offer the CTA and MRA procedures. The court further concluded that Dr. Islam violated the standard of care in his post-procedure management of LeBlanc’s strokes. These violations caused damages to the plaintiffs.
The trial judge granted the motion for JNOV and awarded damages of over $1.6 million, reduced to $109,475 in past medical costs and $500,000 under the medical malpractice cap. The judge also found that Karen was entitled to future medical treatment. Dr. Islam and PCF appealed.
In Joseph v. Broussard Rice Mill, Inc., 00-0628, pp. 4-5 (La.10/30/00), 772 So.2d 94, 99, the supreme court explained the principles to be applied in determining whether JNOV is appropriate as well as this court’s review of the granting of the JNOV:
La.Code Civ. Proc. art. 1811 controls the use of JNOV. Although the article does not specify the grounds on which a trial judge may grant a JNOV, in Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986), we set forth the criteria used in determining when a JNOV is proper. As enunciated in Scott, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Scott, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that “[w]hen there is a jury, the jury is the trier of fact.” Scott, 496 So.2d at 273; Jinks v. Wright, 520 So.2d 792, 794 (La.App. 3d Cir.1987).
|flIn reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Anderson, 583 So.2d at 832.
DISCUSSION — INFORMED CONSENT
A plaintiff in an action based on a failure to obtain informed consent must prove the following four elements in order *288 to prevail: (1) a material risk existed that was unknown to the patient; (2) the physician failed to disclose the risk; (3) the disclosure of the risk would have led a reasonable patient in the patient’s position to reject the medical procedure or choose another course of treatment; and (4) the patient suffered injury. Snider v. Louisiana Medical Mut. Ins. Co., 2013-0579 (La.12/10/13), 130 So.3d 922.
La. R.S. 40:1299.35(A)[6] provides:
Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature ... to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature ... by the patient for whom the procedure is to be performed.... Such consent shall be presumed to be valid and | ineffective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
Karen testified that Dr. Islam recommended angiography after telling her about her past heart attack. She contended that Dr. Islam never went over the consent form with her. Karen recalled that one of Dr. Islam’s employees gave her the consent form, which she signed because Dr. Islam said she needed the test. She also recalled that Dr. Islam’s employee did not go through and explain the consent form, and when she asked the employee what the consent form was for, she was told it was a standard form that explained what Dr. Islam was going to do and how he was going to do it.
Dr. Islam felt in his professional judgment that a carotid angiogram was necessary because of Karen’s cholesterol and hypertension, as well as her family history of heart disease. Dr. Islam testified that based on the ultrasound and because he was going to do a heart catheterization, he recommended that Karen have both the heart and neck done at the same time. Dr. Islam told her that it was best for her given the circumstances, and he wanted to find out any problems sooner rather than later.
Dr. Islam thought that a surgeon considering open heart surgery, for example, would want to know the condition of Karen’s neck arteries. He testified that when he is doing a carotid angiogram and finds blockage in one place, it is more likely that he will find blockages in other areas of the same territory, and thus he would not be justified in leaving there without doing a complete study and knowing the condition of the other neck arteries.
Dr. Islam recalled that Karen’s sister was also present when he explained the procedures. He told Karen to ask any questions, and reminded her to tell him if she came up with any questions after leaving his office. It would be a |nweek between the date she signed the consent form and when the procedures were actually done.
Dr. Stephen Ramee testified on behalf of Dr. Islam as an expert in interventional *289 cardiology and cerebral vascular disease including the cerebral area of the carotid and vertebral arteries. Dr. Ramee has performed over 40,000 angiograms.
Dr. Ramee remarked that it is left up to each hospital to create its own consent form. Dr. Ramee stated that the consent forms he helped make are very general because they have a lot of different tools, a lot of different arteries to visualize, and a lot of different possibilities. He has one consent form for the heart, and another one for the non-heart blood vessels. Dr. Ramee added that Ochsner Hospital, where he was the director of the cardiac cath lab for 20 years, had a consent form that was vague in that it lumped all the vessels together.[7] Dr. Ramee stated that he has the patient sign all the consent forms even though he doesn’t know which procedure he will do.
Dr. Ramee testified that he tries to explain to a patient what he will do, but most of the time he does not know exactly what he will do until he gets inside the vessels. Therefore, he does not tell the patient what catheter he will use or which technique, but instead just tells them he will look at the arteries diagnostically. He generally tells the patient that he will look at the arteries going to the brain, but does not list the arteries individually because the patient does not know the vessel names.

The four-vessel study

112Karen testified that she never saw any reports, including the ultrasound on her neck, and that Dr. Islam never told her the ultrasound showed her vertebráis were normal. Karen denied ever hearing the word “vertebral” until her attorney used it. She also denied that Dr. Islam explained the difference between the carotids and vertebráis.
Karen stated that Dr. Islam told her that she had a blockage in her heart and neck and that he was going to do a test on her heart and neck, but she didn’t know what carotid meant. She added that she did not think Dr. Islam was going to go any farther than the neck area that she called her jugular. She contended that she would not have signed the consent form had she known exactly what Dr. Islam was going to do.
Karen additionally testified that she thought Dr. Islam was going to stop at the heart and go no farther. However, when asked if she knew he was going into the neck but she did not know where, she replied that she was misinformed or did not understand what Dr. Islam called the neck.
Dr. Islam stated that he suggested to Karen that he do a left heart cath as well as an angiogram of her carotids and verte-bráis. He thought that she clearly understood what carotid and vertebral meant.
Dr. Islam explained that what he would normally tell a patient like Karen was that it looked like there was a significant blockage in the left side of her neck in the front, which is the carotids, and he would like to look at that. Dr. Islam continued that he would also tell her that, in addition, he would like to look at her other vessels because a carotid duplex ultrasound is unreliable since it cannot see everything, so he wanted to make sure she did not have any | ^blockages in any other arteries supplying the brain. He added that Karen absolutely understood that.
Dr. Islam believed the standard of care was that he was to look at all four vessels *290 when he did a carotid angiogram.[8] Dr. Islam never considered the neck procedure to be separated into the carotids and ver-tebráis.
Dr. Ramee considered it proper to do a four-vessel angiogram when looking...at the arteries supplying the brain. He also considered it reasonable when he said “carotid” to look at the vertebráis along with the carotids, and he believed that fell within the standard of care.
Dr. Ramee testified that exploring the vertebráis when doing a carotid angiogram makes it a complete study. He felt that a doctor cannot intelligently manage what is going on in the brain without knowing all the blood vessels, and an angiogram of just the carotids did not give enough information about whether the brain had blockage. He added that a heart surgeon operating on Karen would want to know if the brain arteries were clear.
Dr. Ramee also testified that Dr. Islam would not have been following the norm of most physicians who do the test if he had not done the vertebráis at the same time that he explored the carotids. Dr. Ramee said he would have done the same thing under the circumstances since it would have'been an incomplete study if Dr. Islam had not done all four vessels.
Dr. John McClelland, who has been practicing cardiology for 27 years, testified on behalf of Dr. Islam as an expert in cardiology and interventional 114cardiology. Dr. McClelland stated that in general, more often than not when it says carotid procedure on a consent form, it includes the vertebráis.
Dr. McClelland testified that the standard procedure when an angiogram of the carotids is performed is to do a complete study involving visualizing all major branches, and that includes the two carotids and the two vertebráis. He remarked that surgeons want a complete study done. Dr. McClelland considered a four-vessel angiogram to be the standard of care.
Dr. McClelland testified that a doctor should generally do a complete study of the neck and not separate the carotids from the vertebráis. He felt that if a cardiologist is doing a heart catheterization and has some clinical suspicion involving a carotid artery, he should explore the verte-bráis along with the carotids.
Dr. McClelland thought it was best for Karen to have the heart catheterization and carotids and vertebráis all done in one sitting as it was the most convenient way, offered the least risk compared to doing them separately, and was within the standard of care. Dr. McClelland thought that if Dr. Islam used his best judgment under all the fact and circumstances, he was within the standard of care.
Dr. Brian Swirsky, who was board certified in adult cardiology and internal medicine, testified on behalf of the LeBlancs as an expert in internal medicine and- cardiology with subspecialties in diagnostic, invasive, and interventional cardiology. He considered a vertebral angiogram to be a separate procedure from a carotid angio-gram.
Dr. Swirsky testified that an angiogram of the vertebráis is not required just because a carotid angiogram is also being performed. He noted that a 11fivertebral angiogram has a separate billing code from a carotid angiogram, which showed that insurance companies do not mandate that both be done at the same time. Dr. Swir-sky explained that doctors have different billing codes for different angiogram ser *291 vices because they do only the procedures that are indicated and necessary.[9]
Dr. Swirsky testified that it is not the standard of care for a doctor to include the vertebráis at the same time the doctor is doing a carotid angiogram. Dr. Swirsky testified that he has never used the term “complete study,” and has never heard that a two-vessel carotid study is an incomplete study.
Dr. Swirsky believed Karen consented only to a carotid angiography, and he considered it a breach of the applicable standard of care for Dr. Islam not to obtain her consent to the risk of a vertebral angiogram.

Risk factors

Karen admitted that she did not read the risks on the consent form before signing it because she trusted Dr. Islam, and she would not have signed it if she had read the form.
Dr. Swirsky testified that invasive angio-grams risk damaging the blood vessel and dislodging plaque, which could lead to stroke. Dr. Swirsky considered the most serious risk from a vertebral angiogram to be a hindbrain stroke.
Dr. Swirsky pointed out that the risk percentages presented on the consent form were for cardiac catheterizations. Dr. Swirsky thought the stroke risk from a carotid angiogram was 2-4%.
11fiDr. Swirsky did not think the consent form complied with the standard of care because of what was not documented on it and the incorrect risk percentages; therefore, Dr. Islam did not obtain informed consent to perform the vertebral angio-gram. Dr. Swirsky thought most people would have declined the vertebral angio-gram if they were told that their doctor suspected a blockage despite a normal ultrasound and the absence of symptoms, and that the vertebral angiogram carried its own risk of stroke.
Dr. Michael Pappas testified for plaintiffs as an expert in vascular surgery. He is board certified in vascular surgery and general surgery, and has performed thousands of carotid endarterectomies and an-giograms, but he stopped doing procedures in 2002 because of health reasons.
Dr. Pappas stated that the risk percentages listed on the consent form were for left heart catheterizations. He contended that the. vertebral angiogram presented a 1-2% risk of stroke, which was greater than the 0.05 to 0.1% listed on the form. Dr. Pappas testified that the form did not comply with informed consent because it did not include vertebral artery manipulation and did not include the risk of stroke associated with the specific procedure.
Dr. Islam testified that he discussed all of the risks with Karen, and at the end, he asked her if she had any questions or did not understand something.
Dr. Ramee estimated that the stroke risk for a coronary angiogram is around 0.1%, and the stroke risk for a vertebral angiogram is higher, but still less than 1%. He testified that while the risk of a carotid angiogram may be a little higher than a coronary angiogram, that has not been specified in patients who have done both procedures at the same time. Dr. Ramee also referred to a |17study finding that there was a 1% risk of stroke in patients who had heart and cerebral vascular disease studied at the same time.
Dr. McClelland testified that risk of stroke was a known complication of the *292 heart catheterization and the carotid angi-ogram, and that LeBlanc consented to it. Dr. McClelland added that the carotid an-giogram including the four vessels is the gold standard test, so since Dr. Islam was already going to be doing the heart cath, those procedures together would offer the best answer while doing one potential risk event.

Alternatives

In order to prove that a treatment was a reasonable alternative, the plaintiff has to prove that this alternative was an accepted medical treatment for her condition. Morris v. Ferriss, 95-1790 (La.App. 4th Cir.2/15/96), 669 So.2d 1316, writ denied, 96-0676 (La.4/26/96), 672 So.2d 671. A physician, of course, would be under no duty to disclose alternative procedures which were not accepted as feasible. Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843 (La.App. 3d Cir.1979), writ denied, 374 So.2d 658 (La.1979).
When Karen was referred at trial to the acknowledgment in the consent form that Dr. Islam had discussed the alternatives and explained thoroughly the need for the procedure, she stated, “Which he did.” She did not read that section before signing it.
Dr. Islam testified that he discussed alternatives with Karen. He told her the other choices would be not to do a study of her neck and to do another ultrasound in six months to a year, and there were other safer tests that were less accurate, such as MRA or CTA, but while he was doing the heart catheter, |ishe recommended that he also do the carotid angiogram. While he admitted that there was no documentation in the record that he advised her of the CTA and MRA options, he added that he does not write down everything he says to a patient.
Dr. Islam thought the invasive carotid angiogram was the gold standard in 2007. He still does not consider the MRA to be the gold standard. He did not think the CTA, which he said was a diagnostic study, was a substitute for an invasive angiogram.
Dr. Ramee also thought the invasive angiogram was the gold standard test in 2007 for determining the severity and location of blockages in the vessels supplying the brain. The cerebral angiogram gave more information for the diagnosis of cerebral vascular disease, and Dr. Ramee considered it to be more accurate than a CTA or MRA, which present computerized images. Dr. Ramee contended that while the CTA and MTA do not carry the risk of stroke, they do carry the risk of incorrect diagnosis. Dr. Ramee admitted that the CTA and MRA are improving, but he still felt the angiogram was the best choice in 2007. He also acknowledged that Karen had a CTA and MRA after the stroke, but he pointed out that these tests are diagnostic procedures for someone who has had a stroke.
Dr. Ramee agreed that the consent form did not show that Dr. Islam presented Karen with the option of a CTA or MRA. Thus, based solely on the consent form, she was not presented with alternative options. Nevertheless, Dr. Ramee did not think it was below the standard of care for Dr. Islam not to tell her about the CTA or MRA as they are diagnostic tests, not modalities of 1 ^treatment. Furthermore, he stated that he does not tell his patients about every option of diagnostic test available.
Dr. Ramee also testified that the options to be discussed depend on the patient’s knowledge and understanding. He did not think that Karen needed to be told that the angiogram carried a significant risk of stroke, and that the MRA and CTA were alternatives that did not carry the risk of stroke but may not visualize the vessel as *293 well as the invasive angiogram. She already had a risk of stroke from the coronary angiogram, so to unbundle proce-' dures would be unnecessary and probably confusing to her. In addition, Dr. Ramee described the MRA and CTA as expensive procedures, and said one reason doctors bundle procedures is for convenience and cost savings to the patient.
Dr. McClelland noted that the consent form actually referred to “reasonable alternatives,” and he did not think that Dr. Islam needed to actually list the reasonable alternatives on the form. Dr. McClel-land also noted that the form did not state what the alternatives are, but just said “the patient has discussed the alternatives.” He added that by signing the form, LeBlanc acknowledged that Dr. Islam answered all the questions that she may have asked, and that she had been told the alternatives and the possible risks and benefits. The form did not require that the risks and benefits be listed. Dr. McClelland agreed that alternative treatment options could be discussed verbally.
Dr. McClelland testified that his consent form usually does not list the alternatives discussed, but instead just makes the blanket statement that alternatives were discussed. He believed that most doctors likely just note [ 2pthey discussed the alternatives and answered all questions, although some doctors are more precise.
According to Dr. McClelland, the carotid and vertebral angiograms were the gold standard in 2007. While those procedures remain the gold standard, the MRA and CTA have improved a lot. The CTA is just a digital image as opposed to a real time view of the vessels. Dr. McClelland believed that the presence of calcium interfered with interpretation of MRA studies, and that this problem was worse in 2007.
Dr. McClelland testified that if the doctor only had concerns about the neck arteries and not the heart, then he could use the MRA or CTA because they are fine if he is just looking at the anatomy of the neck, although early on, CTA and MRA were not as reliable as they are now. Furthermore, he stated that if there are concerns about the heart and neck, then the doctor puts a catheter in and takes pictures of both, and that is the gold standard exam.
Dr. McClelland agreed that the CTA and MRA were recognized studies in 2007. When he was asked if Karen should have been told there were three ways to check the vertebral and carotid arteries, and that two of the ways had no risk of stroke, he answered that he did not know because the doctor had made his best recommendation and you can give the patient too many choices. Dr. McClelland also thought it was up to the doctor to decide if he wanted to discuss options, although he did not mean to imply that the patient did not have the right to know about the alternatives. Dr. McClelland did not think there was a breach in the standard of care if Dr. Islam discussed the alternatives with her.
Dr. Swirsky believed that CTA and MRA with contrast were acceptable alternatives, and he noted that the consent form did not list them. He |21 considered them as reliable as the invasive vertebral angiogram because not all three types of angiograms have false positives or negatives. Dr. Swirsky considered all three types as the gold standard, with the main difference being that CTA and MRA do not present the risk of stroke. He noted that Karen had both a CTA and an MRA done while at St. Francis to image her carotids and vertebráis, and both showed the vertebráis were normal.
Dr. Pappas thought the CTA and- MRA were recognized reliable studies for imaging the vertebral arteries in 2007. The *294 CTA includes exposure to radiation, but neither option presented a stroke risk. Dr. Pappas testified that the nationally-recognized text with respect to the evaluation of cerebral vascular, disease has pretty much stated that there is no role for intra-arterial angiogram because the images from contrast-enhanced CTA and MRA provide adequate information. Dr. Pappas thought that Dr. Ramee’s opinion that CTA and MRA do not give as much information as cerebral angiography was dated.

Conclusion

Dr. Islam had no doubt that Karen needed all of the procedures, he recommended them, she consented to them, and he did not breach the standard of care. Dr. Swirsky agreed that verbal consent counts as consent, and he conceded that the vertebral study may have been discussed even though it was not documented.
Based on our review of the record, we cannot conclude that the evidence points so strongly in favor of the LeBlancs on this issue that reasonable persons could not reach different conclusions. The JNOV was not warranted to upset the jury finding of no breach of the standard of care for the informed consent claim.
| ^DISCUSSION — STROKE MANAGEMENT
To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794; Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; Samaha, supra.

September 6

Much attention was given at trial to two notations made in the record of neurologist Dr. Roger Kelley in April of 2008. Dr. Kelley wrote that Karen was noted to have had right-sided motor dysfunction during the angiogram. He also wrote that her strokes were not necessarily spontaneous as they occurred around the time of the invasive vascular procedure. The source of this information was unclear, considering that it was not reflected in Dr. Islam’s treatment records, and Dr. Kelley was not present at the procedures which had occurred seven months prior to his evaluation of Karen.
The log from the procedure does not show any complications or unusual events occurring, and Dr. Islam had no recollection of problems occurring. Karen was able to move her arms and legs on command at the end of the procedure, was fully awake, and verbalized understanding. Dr. Islam examined her in the recovery room and found no signs of motor weakness or stroke.
I MThe angiogram flow sheet reflected that LeBlanc was able to move all four limbs following the procedure and when she was discharged.
Karen testified that she felt okay during the procedure, but after she went to the recovery room, she felt sick to her stomach and began vomiting. She said her head hurt and she felt bad throughout her body. She recalled feeling horrible after the procedure. She was put in a wheelchair for her husband to bring her to the car.
Joe LeBlanc recalled that Karen was drowsy right after the procedure. She *295 complained of nausea a few minutes after being brought to the recovery area, and then began vomiting and complaining of headache. Dr. Islam checked her arms and legs and ordered Phenergan. He gave Joe a drawing of the heart and told Joe that a vein in her heart had been blocked and then rerouted itself.
The progress note from Dr. Islam reflected that Karen began feeling nauseous and started vomiting at 10:00, but she was fully alert and oriented and able to move all Of her limbs. After she vomited again the next hour, she was given Phenergan. She was feeling much better at 1:00 and denied any more nausea. She was feeling sleepy, but was not dizzy. She did not have any speech problems, and was alert and oriented. Her neurological exam was again normal, and she exhibited no sign of any cranial nerve impairment.
Dr. Islam recalled that at the time she left his office, there was no indication that she had any motor weakness or any neurological deficit.
Dr. Ramee testified that a stroke following an invasive procedure can be an emergent event depending on when it is recognized. He added that because the patient is sedated, he often does not know about the stroke until well after it happened.
_]_^Dr. McClelland testified that if he was doing a heart catheterization and the patient showed motor dysfunction, he would be concerned and want some help and get the patient to a place where he could get care. He thought it would be an emergency deserving full attention if Karen had developed right-sided motor dysfunction during the angiogram, and he would probably send her to the ER by ambulance.
Dr. McClelland thought it would have been a breach of the standard of care if Dr. Islam had sent Karen home after the procedure if she had shown right-sided motor dysfunction during it. Dr. McClel-land added that if she was not having a stroke in the middle of the procedure, then Dr. Islam did not breach the standard of care.
Dr. Pappas testified that if there is evidence of stroke during or immediately following a procedure, it is not only a medical emergency but is also a category of stroke most responsive to prompt intervention with proper medical management. Dr. Pappas noted that periprocedure strokes in that setting are the most treatable, and Karen could have been treated^with a substance to dissolve the clot if she had no symptoms of brain bleeding. Dr. Pappas added that assuming that after the procedure and while still at Dr. Islam’s office, Karen developed nausea that progressed to vomiting and also developed weakness so that she had to be taken to car by wheelchair, those symptoms suggested a hindbrain cerebellar stroke until an MRI proved otherwise, especially considering that she had a procedure with a known risk of stroke and Dr. Islam was imaging arteries that perfuse the cerebellum.
Dr. Pappas acknowledged that there would be no clinical evidence to suggest a stroke on September 6 if she was alert and oriented, moving all ^extremities, denied vertigo and dizziness, had no speech problems, and was not weak or unable to walk. He also admitted that without seeing the patient and performing the neurological exam following the procedure, he could not comment that she did or did not have a stroke on September 6; however, if she had generalized weakness and could not walk after the procedure, then the index of suspicion should have been high because the cerebellum controls that function.

Stroke management on September 7

Dr. Islam gave Karen’s sister his cell phone number and told her to call him if there were any changes in Karen’s condi *296 tion. He later called that evening to check on Karen. Her sister told him that Karen had eaten supper and thrown up one time afterwards, but was resting and not having any problems. He reminded her to call him anytime that night if anything happened, and to bring her to his office in the morning.[10]
Karen testified that she threw up at her sister’s house after the procedure, and that she was nauseated the entire night and her head hurt. When Dr. Islam called around 9:30 a.m., she told him that she was still sick to the stomach, her head hurt, and she could not sit up and walk. She claimed that Dr. Islam told her to be at his office at 11:00. She had to use a wheelchair again to get to and from the car.
Dr. Islam recalled that when he called the next morning to check on Karen, her sister told him that her speech was a little slurred. He was concerned because he knew that the angiogram could cause a stroke. He told Anthem to come to his office immediately, but they did not arrive until about 90 minutes later.
Dr. Islam said he examined her immediately after she arrived "at his office. He found her speech was a little slurred, but she was alert and oriented to time, place, and person, and was not confused. She did have some weakness in her right arm, as well as double vision. Her right hand was uncoordinated, which is a marker for a hindbrain stroke.
Karen recalled that Dr. Islam checked the strength in her hands and checked her eyes, and then told her at around 11:30 that she had had a stroke.
Because Dr. Islam recognized that Karen had suffered a stroke, he immediately contacted Dr. Shelat, a stroke specialist, and told him everything that occurred starting with the heart catheterization and carotid angiogram. Dr. Shelat accepted the consultation, which to Dr. Islam meant that Dr. Shelat was responsible for telling him what to do. Dr. Islam followed Dr. Shelat’s instructions and wrote an admission order to admit her under Dr. Islam’s care since Dr. Shelat was out of town. He ordered a CT scan of her head with and without contrast, and the administration of Lovenox, all in accordance with Dr. She-lat’s instructions. Dr. Islam faxed the admit order to the hospital as per protocol. When he learned that a bed was not available at the moment, he called Dr. Shelat back. It was then that Dr. Islam told Karen that they could stay at his office or could go home and then go to the hospital at 3:00 when the bed would be available.
Karen testified that when she got to the hospital at the appointed time, she was a little incoherent, things were blurry, her head hurt, and she was weak and unable to walk. She thought her condition probably worsened between |2711:30 and 3:00 since she could talk to Dr. Islam while at his office, but was incoherent by the time she went to the hospital. Joe testified that Karen could only talk a little when she was at Dr. Islam’s office the second day.
Dr. Islam asked Dr. Shelat to take care of her stroke because such expertise was outside of Dr. Islam’s scope of knowledge. Dr. Shelat could have declined the consult instead of accepting it, and then he would have asked another neurologist for help.
Dr. Islam testified that after he told Dr. Shelat there was no bed available at the time, Dr. Shelat did not tell him to send her to the ER or to go to another hospital. He gave Karen the option to stay at his office or to go home until a bed was avail *297 able, even though Dr. Shelat did not instruct him to send her home.
Dr. Islam thought he did the best that he could after he diagnosed the stroke and tried to get her into the hospital as soon as possible. He followed all of Dr. Shelat’s instructions and would have sent her to the ER if Dr. Shelat had instructed him to do that.
Dr. Islam acknowledged that it is critically important to know whether a stroke is an embolic one or a hemorrhagic one, because it dramatically changes the medical management. A person with a hemorrhagic stroke never gets a thrombolytic drug. A CT scan will rule out hemorrhage. Once a stroke is determined to be an embolic stroke, the doctor needs to determine when the symptoms started because that is the starting time for the window of opportunity for stroke management.
Dr. Islam did not think that St. Francis had a stroke team in 2007. He thought a stroke team would include a neurologist, an intervention radiologist 12Rto do an angi-ogram, and a neurosurgeon on call. After a stroke patient receives a blood thinner, there is a high risk of bleeding in the brain, so a neurosurgeon needs to be available to take the clot out. Even if Karen had gone to the ER from his office, it would still take time to do a CT scan and administer medications.
Dr. Islam did not think they were using the stroke drug tPA in the ER in Monroe in 2007. The major obstacle to using a thrombolytic after a stroke is the doctor has to know when the stroke occurred. If the patient is outside the treatment window of six hours, then a powerful blood thinner would not benefit her. The stroke time cannot be presumed. Dr. Islam said he was not told when the slurred speech began so he did not know when the stroke started. The slurred speech was evident when Karen woke up, so it was possible her stroke occurred during the night.
Dr. Ramee testified that when he discovers that a patient at his office has had a stroke, he treats it as an emergency and consults with the stroke team and they basically take over. They have vascular neurologists who answer the phone for stroke management. Dr. Ramee, who considers himself a stroke expert, used to be on the stroke team.
Dr. Ramee testified that it is an emergency once a stroke has been recognized, and if a patient came to his office the day after a procedure with stroke symptoms, he would admit the patient to the hospital to the stroke service.
Dr. Ramee testified that the window of opportunity for intervening in a stroke is small, in the range of three to six hours. He acknowledged that even if he thinks a stroke may have happened a day earlier, it is still an emergency |Mbut there is less they can do about it. Dr. Ramee would consider it an emergency if the onset of stroke symptoms began within six hours of his seeing the patient the next day at his office, and then he would send the patient to the ER. Dr. Ramee added that if the patient and family are uncertain about exactly when symptoms began, he would still consider it an emergency and send the patient to the ER. He stated that he would not send a patient home and tell her to go to the hospital in a few hours if he was uncertain when a stroke began. Dr. Ra-mee testified that if a general cardiologist does an interventional procedure and the patient comes in the next morning with stroke symptoms, and the cardiologist tells the patient she had a stroke, he would consider it to be an urgent, if not emergent event. He thought that a cardiologist in that scenario should at least immediately *298 call a stroke doctor and get some advice on what to do.
Dr. Ramee testified that assuming that Karen returned to Dr. Islam’s office around 11:00 the morning after the procedure and Dr. Islam concluded that she had had a stroke, that Dr. Islam called one hospital and tried to reach a neurologist who was out of town, and that Dr. Islam told her husband to keep her at home and go to. the hospital at 3:00, then this is not what Dr. Ramee would have done — he probably would have sent her to the ER. However, Dr. Ramee would not say that Dr. Islam’s conduct was below the standard of care expected of an interventional cardiologist if those were the facts.
When asked if it was unreasonable to send Karen home until a bed was available at 3:00, Dr. Ramee replied that it was not unreasonable, and that her stroke was not severe enough to warrant tPA, which is a powerful clot buster. He stated that a problem in the U.S. is that even after a stroke patient gfets to the |3nER, she is usually not treated emergently. Dr. Ra-mee thought it was probably too late to do anything for Karen, and what could have been done was probably limited at that point in time. Dr. Ramee though that Dr. Islam did his best and complied with the standard of care.
Dr. McClelland would not think it was the right thing to do to send a suspected stroke patient home for a few hours to wait for a bed to become available at the hospital, and would consider it to be substandard care. He thought that when he reviewed Dr. Islam’s records, it was his impression that Dr. Islam sent her to the hospital immediately after diagnosing her stroke.
Dr. McClelland answered that he did not think it was optimal care if, after diagnosing the stroke, Dr. Islam called the hospital, found no bed available, and told Karen’s husband to take her home before going to the hospital at 3:00. Although Dr. McClelland acknowledged there were no beds available, he still wished that she could have gone straight to the hospital. Nevertheless, Dr. McClelland testified that he had not heard anything at trial that changed his opinion that Dr. Islam did not breach any standards of care when treating Karen.
Dr. McClelland stated there was no breach of the standard of care, and Dr. Islam did everything he could under the circumstances if:
• there were no complications during the procedures;
• Karen threw up twice in the recovery room and was given Phenergan;
• Dr. Islam examined her twice and all her motor functions were normal, she was alert and oriented, he could understand her speech, and her eyes were fine;
• Dr. Islam sent her home but called her that night and was told by her sister that she was fine;
E* Dr. Islam called her the next morning and heard slurred speech, so he asked her to come to his office, where he examined her and concluded she had .suffered a stroke; and
• Dr. Islam consulted with an out-of-town neurologist who gave him admitting orders to St. Francis, he faxed the orders to St. Francis, the hospital told him they would not have a bed available until 3:00, and he told Karen to go to the hospital then.
Dr. Pappas thought that telling the Le-Blancs to go home and then go to the hospital at 3:00 was gross negligence and patient abandonment because Karen was left in a situation where there could only be worsening of the neurological deficit and she missed the opportunity possibly to limit the deficit. Dr. Pappas thought Dr. *299 Islam had a duty to have an ambulance immediately transport Karen to the ER on September 7 because all of the things that needed to be done immediately, such as the CT scan and administration of Plavix and Lovenox, could have been done in the ER.
Dr. Pappas believed that Dr. Islam did not have to be a neurologist to know how to properly assess and manage the symptoms of the stroke that he caused.

Conclusion

Dr. Islam properly managed Karen’s care on September 6. He gave her Phener-gan to treat her nausea and vomiting, and ensured she was not showing neurological deficits following the procedure. He also followed up on her that evening and the next morning.
Although Dr. Islam’s decisions after the stroke diagnosis on September 7 were not optimal, he did the best he could under the circumstances. He realized that he was venturing into an area where others had more expertise, so he consulted with Dr. Shelat and followed his instructions.
| «This record contains expert testimony that, if credited by the jury, supports a finding that Dr. Islam’s care for his patient was acceptable. The case was close and the jury ruled. We note that had the jury ruled otherwise, we would not allow the trial court to disturb that verdict either.
Because the facts and inferences do not point so strongly and overwhelmingly in favor of the LeBlancs that reasonable persons could not arrive at a contrary verdict, the JNOV was also not warranted on this issue.
DECREE
At appellees’ costs, we REVERSE the judgment granting the JNOV and REINSTATE the judgment in accordance with the jury verdict.

. When Karen provided her family history, she told Dr. Islam that her father had coronary artery disease, a heart attack, open heart surgery, a stroke, ánd then died from a heart attack at age 57. Her mother, who .died at age 84, had coronary artery disease and is-chemic cardiomyopathy. One brother died at age 49 from a heart attack, and another brother died at age 51 from a heart attack. A third brother has had a heart attack but survived it.

. Dr. Islam thought her cholesterol level was terrible. She told him that she used to take a cholesterol drug until it caused neck pain.

. Among Dr. Islam’s impressions of the echo-cardiogram was significant apical and adjacent anterior wall and septal hypokinesis.

. The ultrasound showed mild calcified plaque in the right internal carotid artery ('TCA”), and moderate homogenous plaque in the bilateral ICA. Stenosis of 30-49% was observed in the right common carotid artery ("CCA”), proximal ICA, and distal ICA. Sten-osis of 50-69% was observed in the left distal ICA. Stenosis of over 70% was seen in the left CCA and proximal ICA.

. The LeBlancs additionally claimed that Dr. Islam committed medical malpractice in doing a vertebral angiogram, but their counsel conceded that issue at the hearing on the motion for JNOV.

. La. R.S. 40:1299.40 was amended and reenacted by Act 759, § 2, of 2012 to consist of La. R.S. 40:1299.39.5 to 40:1299.39.7. The general subject matter remained unchanged.

. Dr. Ramee added that Ochsner has a coronary diagnostic consent form and a coronary intervention consent form, as well as two forms for the brain, one for diagnosis and one for treatment.

. The pre-op/procedure history form completed on September 6, 2007, stated that they would proceed with a LHC and a "4 vessel carotid angiogram.”

. We note that the billing codes are separate, but they fall under the heading of carotid angiogram.

. His staff also called her that evening, but he was unsure if it was before or after he called. His staff always calls and checks on his patients after an angiogram.