705 So.2d 276 (1997)
James H. HAMMONS, Plaintiff-appellant,
v.
CITY OF TALLULAH, et al., Defendant-appellee.
No. 30091-CA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 1997.
Rehearing Denied January 15, 1998.
*278 H.P. Rowley, III, Covington, for Plaintiff-Appellant.
Raymond L. Cannon, Tallulah, for City of Tallulah.
Theus, Grisham, Davis & Leigh by F. Williams Sartor, Jr., Monroe, for DCAA.
Davenport, Files & Kelly by William G. Kelly, Jr., Monroe, for USF & G.
Before BROWN, CARAWAY and PEATROSS, JJ.
CARAWAY, Judge.
James Hammons tripped and fell while walking on a sidewalk in Tallulah, Louisiana. Hammons fell in front of the half-way house operated by Delta Recovery Center, where he resided. Hammons sued the Delta Recovery Center, its parent company Delta Community Action Association, the City of Tallulah and the owner-lessors of the property on which the Center was located. The trial judge granted the lessors' motion for a directed verdict at the close of the plaintiff's case. A jury found in favor of both Delta entities and the trial judge found in favor of the City of Tallulah on the issue of its liability for the public sidewalk. We hereby reverse the ruling which found the City of *279 Tallulah free from fault and render judgment in favor of Hammons.

Facts
Delta Recovery Center leased a residence located at 401 East Washington in Tallulah, Louisiana and converted it into a recovery center for chemically dependent people. The Center contracted with the State of Louisiana to provide lodging, meals, washing machines, transportation, medical referrals, job placement, and therapy, such as Alcoholics Anonymous, for recovering alcoholics. After providing the services, the Center submitted its invoices to the State for reimbursement. The Department of Health and Human Resources regulated the Center and performed annual inspections. Upon entering the Center, patients signed an agreement relinquishing their right to all governmental subsidies in exchange for the services provided by the Center.
On July 8, 1988, Hammons, who was a patient at the Center, left the residence at approximately 6:00 p.m. to walk to the post office. Hammons walked out the front door of the residential dwelling and down a concrete walkway equipped with hand railings for the handicapped to the public sidewalk and turned right. (See photos attached as Appendix A.) Hammons chose to turn onto the sidewalk instead of proceeding further on the railed walkway to the street because a parked vehicle was blocking his access to the street.
After walking only a few feet, he stumbled and fell approximately where the Center's driveway intersects the sidewalk. The driveway was located over a culvert in the drainage ditch located in front of the Center and adjacent to the street and sidewalk. Although the Center's driveway was located at the rear entrance on the side street, the Center's vehicles at times drove over the front culvert and the remnants of the broken sidewalk in order to park in the side yard of the facility.
A man standing in his yard across the street from the Center heard Hammons moaning and found him lying on the sidewalk with ants on him. Someone summoned help and an ambulance transported Hammons to the hospital. At the emergency room, Hammons reported that he had tripped and fallen injuring his lower back and right shoulder. Hammons also indicated that he had lost consciousness after the fall and suffered from nausea. Dr. Lawrence F. Chenier, the emergency room physician, diagnosed Hammons with lumbosacral sprain and a right shoulder sprain.
The day following the accident, Hammons examined the area where he fell and found a broken guy wire anchor[1] measuring approximately 15-18 inches encroaching on the sidewalk. Although unable to recall the exact events immediately prior to his fall, Hammons attributed his accident to the dilapidated sidewalk and the broken guy wire anchor, which may have caught his foot. The neighbor who discovered Hammons stated that the broken guy wire anchor next to the sidewalk was clearly visible and had been there for some time.
Austin Gordon, the Center's night superintendent, testified that the sidewalk had been broken at least since 1985 and that he had seen the broken guy wire anchor prior to Hammons' accident. Mr. Gordon was the only Delta employee who admitted knowledge of the guy wire anchor prior to the accident.
C.J. Oney, the maintenance superintendent for the City of Tallulah, admitted that he visited the Center on several occasions but denied ever noticing the sidewalk. When questioned about the deteriorating sidewalk, Oney stated that the City had no program to inspect or detect broken sidewalks. Basically, the City performed no repair to its sidewalks until a resident complained. After examining pictures of the sidewalk and the culvert used as a driveway, Oney testified: "This sidewalk should have been broken up before now. They should have taken it out. If I had ... if I had put it in I would make them take the sidewalk up." Later Oney *280 stated: "When they put that driveway in there they should have taken all this out."
Kenneth M. McKay, a certified land surveyor, who had surveyed the city lot and street, testified regarding the boundaries of the property. The original width of East Washington Street on the town plat is sixty feet. McKay found in his survey that the drainage ditch and sidewalk lay within the sixty feet provided for the street, lying immediately north of the lot in question. The two northern corners for the lot at 401 East Washington were found by McKay to be marked by existing iron stakes on the south line of the sidewalk.

Rulings of the Trial Court
At the close of plaintiff's case, the trial court entered a directed verdict in favor of the owner-lessors stating that the plaintiff failed to introduce any evidence that indicated the owner-lessors, who were adjoining property owners, installed the guy wire anchor or caused the damage to the sidewalk.
At the close of Delta's case, the jury was charged to determine the liability of Delta with the following jury interrogatory:
3. Do you find that plaintiff, James Hammons, has proven by a preponderance of the evidence that a reasonably foreseeable hidden dangerous condition existed on property adjacent to the property occupied by the half-way house?
 YES _____ NO _____
If your answer to question 3 is NO, then stop. You have reached a verdict in favor of defendants.
The jury answered no to interrogatory number 3 and ended its deliberation.
After releasing the jury, the court ruled on the issue of the City's liability as follows:
In this case, the court now faces the job of having to decide the question of any liability on the part of the city. Now, remember that the obligation no longer just whether or not a condition existed so-to-speak, but the proof has to be made ... has to be shown that the City knew about this or that they had been notified. The burden is on the plaintiff for showing this. While it's not a pleasant duty for the court to see people come into court and then turned away, nevertheless, justice must be done in all cases. The court in this case is of the same opinion that the jury was and that plaintiff has failed to carry his burden of proof. It will therefore be a decision in this case for the City with no liability.
From these adverse judgments dismissing the various defendants, Hammons appeals.

Discussion: City's Liability
The City has a duty to maintain its sidewalks in a reasonably safe condition. To render the City liable in damages the defect complained of must be unreasonably dangerous or calculated to cause injury so that an unreasonable risk of harm is determined to exist. Boyle v. Board of Supervisors, Louisiana State University, 96, 1158 (La. 1/14/97), 685 So.2d 1080.
In deciding whether something presents an unreasonable risk of harm, the court must weigh the magnitude and probability of injury against the burden of preventing the injury. Entrevia v. Hood, 427 So.2d 1146 (La.1983). The risk-utility balancing test weighs factors such as gravity and risk of harm, individual and societal rights and obligations, and the social utility involved. Boyle, supra. The determination of whether a thing presents an unreasonable risk of harm should be made "in light of all relevant moral, economic, and social considerations." Celestine v. Union Oil Co. of California, 94, 1868 (La. 4/10/95), 652 So.2d 1299.
A determination of whether the sidewalk is unreasonably dangerous is only the first step in the analysis. Under La.R.S. 9:2800, the City of Tallulah cannot be liable for damages resulting from a defective condition without proof that it had actual or constructive knowledge prior to the occurrence of the particular vice or defect which caused the damage, and that the city had a reasonable opportunity to remedy the defect but failed to do so. La.R.S. 9:2800 B; Campbell v. Louisiana Dept. of Transp. and Dev., 94-1052 (La. 1/17/95), 648 So.2d 898. Under La.R.S. 9:2800(C), constructive notice is defined as "the existence of facts which infer actual knowledge." This definition allows *281 for the inference of actual knowledge to be drawn from facts demonstrating that the defective condition had existed for such a period of time that it should have been discovered and repaired if the public body had exercised reasonable care. Lutz v. City of Shreveport, 25,801 (La.App.2d Cir. 5/4/94), 637 So.2d 636.
Additionally, in this instance, it is significant to note the statutory power of the municipality to require the repair of damaged sidewalks by the owner of the land abutting upon such sidewalk, or, in lieu thereof, to repair the sidewalk at such owner's expense. La.R.S. 33:792 and 793.
From our review of the condition of the sidewalk and the plaintiff's description of his fall, we cannot escape the conclusion that the sidewalk was unreasonably dangerous and its deteriorated condition was at least a contributing cause of the accident. The accident occurred at a place where a large sloping separation in the slabs existed. (See Appendix.) Regardless of whether the guy wire anchor actually tripped the plaintiff, the anchor was at that location of the separated concrete and was leaning over into the path of the cracked remains of the slab segments. Those segments were out of alignment and sloping downward into the adjacent drainage ditch due to obvious erosion that had undermined the slabs.
The trial judge's ruling exonerated the City from its duty regarding this sidewalk based upon his determination that the City did not have actual notice of the poor state of the sidewalk. His ruling did not address the issue of constructive notice which in this instance we determine to be present. The evidence demonstrated that over a lengthy period of time the cracked, sloped misalignment of the slabs had developed and that the condition was clearly apparent. Mr. Oney's candid admissions regarding the poor condition of the sidewalk, the City's lack of any policy for inspection, and his own visits to the Center provide ample evidence of the City's constructive notice in this instance.
While mindful of the supreme court's recent ruling in Boyle, supra, that every crack in a sidewalk may not result in liability to the public entity, we judge the evidence in this case as demonstrating a sidewalk in such obvious state of disrepair that the requirements for liability under La.R.S. 9:2800 are fully met. The trial judge's ruling regarding the City's liability was clearly wrong.

Delta Recovery Center's Liability
The evidence presented by the defendant's surveyor at trial established that the City's ownership of sixty feet for the adjoining street included the black-topped portion of the street, the drainage ditch, and the sidewalk. The residential lot upon which the Center was located extended only to the edge of the sidewalk.
The general rule is that a public sidewalk is not within the adjacent property owner's custody or garde, and therefore, the property owner is not strictly liable under La.C.C. art. 2317 for defects in the sidewalk unless the property owner created the defect. Pettis v. Hibernia National Bank, 94-1111 (La.App. 4th Cir. 12/15/94), 648 So.2d 27; St. Paul v. Mackenroth, 246 La. 425, 165 So.2d 273 (1964). Despite the statutory authority allowing the City to impose the cost of repair and maintenance of sidewalks upon the abutting property owner, the primary obligation toward the public to maintain sidewalks in a safe condition rests with the municipality. Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4th Cir.1988); Snow v. City of Shreveport, 287 So.2d 647 (La.App. 2d Cir. 1973).
Nevertheless, a particular defendant in possession of abutting property may not escape liability by the mere fact of his status as a non-owner. Jones v. Gillen, 504 So.2d 575, (La.App. 5th Cir.1987). The jurisprudence has considered the duty of the owner or possessor who actually knows of a dangerous condition upon adjacent property. Cothern v. LaRocca, 255 La. 673, 232 So.2d 473 (1970); Lowe v. Thermal Supply of Shreveport, Inc., 242 So.2d 351 (La.App. 2d Cir.1970); and Thumfart v. Lombard, 613 So.2d 286 (La.App. 4th Cir.1993). If such adjacent property is utilized for access to a defendant's property and such known condition poses a threat to the safety of the defendant's *282 invitees, the defendant may be held liable for negligence for a breach of duty measured under the duty-risk analysis. Jones v. Gillen, supra.
The above expressions of the law were contained in the charge presented to the jury. Nevertheless, plaintiff complains that Interrogatory Number 3, quoted above, improperly required the jury to find that a "reasonably foreseeable hidden dangerous condition existed on the property adjacent to" the Center before assessing negligence to the Center. Although we agree that this constructed string of adjectives setting the test for the "condition" of the sidewalk might be confusing to the jury, the charge to the jury of the applicable law was clear and appropriate.
In any event, even if we were to consider the jury interrogatory to be so erroneous as to have misled the jury, our review of the evidence leads us also to conclude that the Center did not breach a legal duty to the plaintiff in this setting. Appropriate access routes from the Center's property to the city streets were available to the Center's residents through the front door walkway to the street, constructed with railings for the handicapped, and through the rear entranceway across a concrete drive to a side street. The Center had constructed adequate access routes that extended beyond its property and across the adjacent City property (the drainage ditch and sidewalks) completely to the streets upon which the corner lot was located. The alternative route which Hammons chose was not an exit route routinely utilized by the residents and was clearly outside the railing along the walkway for the handicapped which extended to the street. Under the circumstances, in view of the established law regarding the adjacent owner's limited responsibility for accidents on sidewalks or adjacent property, we do not determine that the Center breached a duty to the plaintiff. For the same reason, we also affirm the trial court's judgment dismissing the claim against the owners/lessors of the property.

Plaintiff's Fault and Comparative Negligence
Our emphasis above regarding the City's constructive notice of the obviously deteriorated sidewalk is also a factor indicating fault on the plaintiff. Hammons chose to make his fateful turn onto the sidewalk and away from the smooth walkway provided by the Center which was equipped with handrails for his access off the property. To the extent that his path was blocked by a vehicle parked on the street at the end of the walkway, Hammons had the option of returning into the Center and exiting at its rear entrance to the side street. Hammons' choice of attempting to negotiate the sidewalk is further cast in a dim light by his physical condition. At that time, he was recovering from a recent shoulder surgery which resulted in his arm being immobilized in a sling.
A plaintiff's poor choice of action which is a substantial factor in contributing to the injury has been reviewed by our supreme court in defining our principles of comparative fault. In Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1134 (La.1988), the court stated:
"... [i]n any case where the defendant would otherwise be liable to the plaintiff under a negligence or strict liability theory, the fact that the plaintiff may have been aware of the risk created by the defendant's conduct should not operate as a total bar to recovery. Instead, comparative fault principles should apply, and the victim's "awareness of the danger" is among the factors to be considered in assessing percentages of fault." Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).
Following Murray, in a similar factual setting involving a swimmer's diving accident, the court, in Socorro v. City of New Orleans, 579 So.2d 931, 941 (La.1991), further explained its ruling in Murray as follows:
"In Murray, plaintiff was injured by diving into a motel swimming pool. We held that the old doctrine of assumption of risk, formerly a bar to recovery in such cases, has been subsumed into the comparative fault system such that Murray's taking the risk of diving into the shallow pool could no longer bar his recovery but should rather reduce it on a percentage-fault *283 basis. Having failed to prevail on its assumed risk argument, the Murray defendant then fell back upon exactly the same "no-duty" argument that the City now asserts. We explained that a defendant's duty is not to be defined in terms of the plaintiff's actual knowledge or conduct.
* * * * * *
"Therefore, Murray requires a review of the City's duty separate and apart from any knowledge the plaintiff had or should have had of the danger he was encountering."
With these pronouncements as our guide, we likewise determine in this case that the actions of the City and Hammons were substantial factors in causing the plaintiff's injuries. The City's long neglect of the sidewalk created the unreasonable risk of harm. Hammons' choice of using the sidewalk, particularly with his shoulder condition, helped to bring about the fall.
In comparing the fault of the parties, the factors for assessing the nature of the parties' conduct are set forth in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), as follows:
(1) whether the conduct results from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Applying these factors, we accept the trial judge's finding that the City had no direct knowledge of the sidewalk's condition and assess the City's conduct as resulting from its inadvertence in failing to periodically review the condition of its sidewalks. Hammons' conduct, however, had to have involved a direct awareness of the danger of the sloped and cracked concrete disorder beneath his feet. Nevertheless, we cannot discount the City's conduct significantly more than Hammons', due to the risk it created by forcing pedestrians away from the remains of its sidewalk system and into the street.
In addition to assessing the nature of the conduct of the parties by the above factors, the Watson decision also requires that the extent of the causal relationship between the conduct and the damages be considered. From this consideration, we find that Hammons' ill-considered choice was a cause that was more directly related to the fall and injuries he suffered. From this analysis, we therefore assess the plaintiff with the greater portion of fault in this instance which we determine to be 75%.

Quantum
Prior to his fall in July, 1988, Hammons' medical history included two back surgeries during the 1970's, a car accident in 1987 that resulted in persistent headaches, two heart surgeries, hip surgery, and a right shoulder repair in June 1988 that required Hammons to wear a restrainer to immobilize his arm. Hammons also suffered from depression prior to his fall which required him to take antidepressant medicine. At the time of the accident Hammons was receiving social security disability benefits.
Immediately after the fall, Hammons was taken to Madison Parish Hospital Emergency Room where he was treated by Dr. Lawrence Chenier for low back pain, shoulder pain, headache and nausea. Dr. Chenier diagnosed Hammons with a lumbosacral sprain and right shoulder sprain and treated him with an injection for pain and a prescription for Tylenol 3. Hammons left the emergency room and returned to the half-way house later the same evening.
Hammons saw Dr. Chenier on July 14, 1988, with complaints of shoulder pain and low back pain. On his next doctor visit, October 13, 1988, Hammons complained of low back pain and Dr. Chenier detected tenderness in the area. On January 20, 1989, Hammons saw Dr. Chenier for an unrelated medical problem and did not complain of any pain in his back or shoulder. In summary, *284 Hammons fall resulted in a soft tissue injury which aggravated his pre-existing back and shoulder injuries for a period of not more than six months. During this six month period Hammons occasionally suffered from headaches and visited the doctor with complaints of pain on two occasions. His medical bills totaled $650.50.
Once it has been determined that the trier of fact is clearly wrong, the appellate court is empowered by La C.C.P. art. 216 to render any judgment which is just, legal and proper. Courts of appeal may award damages when the trial court initially rejects plaintiff's demands and where the record contains sufficient proof of damages. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by record. Beckham v. St. Paul Fire & Marine Ins., 614 So.2d 760 (La.App. 2d Cir.1993).
We hereby award James Hammons $12,500 in general damages and $650.50 in special damages.[2] This award is hereby reduced by the percent of fault attributable to plaintiff.

Conclusion
For the foregoing reasons, we affirm the judgment of the trial court dismissing the claims against Delta Recovery Center, Delta Community Action Association and the owners-lessors of the half-way house. We find, however, that the dilapidated sidewalk presented an unreasonable risk of harm and the City of Tallulah had constructive notice of its condition. Accordingly, we reverse and render judgment against the City of Tallulah in favor of James H. Hammons in the amount of $13,150.50. This judgment is hereby reduced by 75%, the percent of fault attributable to plaintiff.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
*285 
*286 APPLICATION FOR REHEARING
Before BROWN, STEWART, GASKINS, CARAWAY and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] Although the guy wire anchor had no cable attached to it, it was in close proximity to a utility pole. The trial court's earlier summary judgment proceeding dismissed plaintiff's claim against the owner of the utility pole.
[2] In Budget Rent-A-Car of New Orleans v. Gradnigo, 611 So.2d 147 (La.App. 3d Cir.1992), the court awarded $15,000 for injuries to plaintiff's head, neck, left shoulder and her arm. Plaintiff had to wear a cervical collar and take physical therapy and suffered headaches up until trial. Her left arm is permanently scarred and the only remedy is surgery. In Billiot v. Cline, 27,396 (La.App.2d Cir. 9/27/95), 661 So.2d 537, the trial court awarded $6,600 to the plaintiff who slipped and fell. Plaintiff was x-rayed at the emergency room of Bossier Medical Center, treated with pain medications and underwent three months of conservative treatment.