GARRETT, J.
|rIn this medical malpractice case, the widow and adult children óf the late L.D. Johnson, Sr. — who' allegedly died as the result of negligence on the part of the staff at a nursing home where he had been a resident — appeal from a jury verdict and judgment that awarded only $100,000 in survival action damages. The children also appeal from the jury’s failure to grant them any damages for wrongful. death when the widow was awarded $75,000 for such damages.[1] The Louisiana Patient’s Compensation Fund (“PCF”) also appeals the award of judicial interest from April 8, 2009, and from the trial court’s action in granting the plaintiffs’ motion for judgment notwithstanding the verdict (“JNOV”), which awarded recovery of all medical bills introduced at trial. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.
*699 FACTS '
Mr. Johnson, age 80, was admitted to Green Meadow Haven Nursing and Rehabilitation Center (“Green Meadow Haven”) in Coushatta on July 7, 2008. He had suffered a stroke and had several other health issues, some heart-related. He was also incontinent, had only one kidney as the result of kidney cancer, and required an indwelling catheter, as per his doctor’s orders.
On November 11, 2008, his Foley catheter was removed, possibly by Mr. Johnson. However, it was not replaced by the nursing staff, apparently following a nursing home policy not to reinsert a catheter if it came out. When one of his daughters, Cathy Redding, visited him on November 15, | p.2008. he was unresponsive. According to the nurse’s notes, he was not responsive to verbal or painful stimuli. He was taken to Christas Coushatta Health Care Center by ambulance that afternoon. When a catheter was inserted in thé emergency room, 800 milliliters of “thick, brownish urine,” more than thrée times the normal amount expected upon insertion of a catheter, was released. Mr. Johnson had developed a urinary tract infection (“UTI”), which had progressed into severe sepsis and septic shock. Later that evening, he was transferred by ambulance to .Christas St. Francis Cabrini Hospital (“Cabrini”), an acute care facility in Alexandria. Various family members followed in another vehicle. At Cabrini, he was admitted to the intensive care unit for treatment of septic shock.. He was also found to have acute renal failure, for which he was aggressively hydrated. He was further diagnosed with Clostridium difficile colitis; congestive heart failure, secondary to his hypermetabolic state due to the sepsis; and atrial fibrillation. His biliru-bin rate was elevated, and his ultrasound result was consistent with acalculous chole-cystitis (or acute inflammation of the gallbladder in the absence of gallstones). Following treatment, his white blood count started to decline 'and his clinical status improved. Nonetheless, according to his medical records, a consulting doctor described him on November 18, 2008, as remaining “critically ill with [a] guarded prognosis.” ■
On November 19, 2008, Mr. Johnson was transferred to Dubuis Hospital (“Dubuis”), a long-term acute care facility, where he remained for about three weeks. On December 12, 2008, he was. released to Leslie Lakes | Retirement Center . (“Leslie Lakes”), a skilled nursing facility. On December 15, 2008, he was noted as having increased lethargy. He was transferred by ambulance to the emergency room of Minden Medical Center, where he was admitted with a fever, UTI, altered mental status, and worsening renal insufficiency. His condition progressively worsened, and he died on December 25,2008.
A complaint against the nursing home was filed by Mr. Johnson’s family in April 2009. A medical review panel (“MRP”) was later convened to consider the complaint, and its opinion was rendered- in April 2011. Two of the three doctors, Dr. E. Allan Webb and Dr. Clarence R. Teaglé (both of whom are board-certified in internal medicine), concluded that, by failing to reinsert the catheter or consult with Mr. Johnson’s treating physician, the nursing home staff had breached the standard of care. They opined that the breach “led to a chain of events causing a downward spiral of Mr. Johnson’s already compromised health.” As a result, they found that the breach caused and/or contributed to his death. The third panel member, Dr. Allen J. Herbert (who was board-certified in family practice), disagreed, stating that Mr. Johnson appeared to make a good recovery from the UTI, sepsis and septic *700 shock. Given Mr. Johnson’s age and “vast array” of medical'problems, 'Dr. Herbert did not find that the nursing home staffs action constituted a breach of the standard of care. If it was a breach, he was not comfortable stating that it contributed to or hastened Mr. Johnson’s death.
Suit was filed on September 14, 2011, by Mr. Johnson’s widow, Claudia Johnson, and nine of his 10 children (“the plaintiffs’’).[2] Named as defendant was OLD, Inc., the entity doing business as Green Meadow Haven; it answered the petition with a general denial. In December 2011, Mr. and Mrs. Johnson’s remaining child, Ms. Redding, filed a motion to intervene hi the original petition.[3]
In January 2012, the appellants filed a petition for authority to settle with reservation of rights. They stated that they had settled with the nursing' home for $100,000, while reserving their rights against the PCF to seek additional recovery, plus medical expenses and legal interest from the date of filing of the original claim and costs. The PCF filed an opposition to the petition, in which it offered no objection to the underlying settlement while affirmatively asserting that the damages spught were not caused by the nursing home’s employees and pleading the-limitations of recovery in the Louisiana Medical Malpractice Act (“LMMA”). Judgment was signed on February 16, 2012, approving the settlement, dismissing all claims against the nursing home (which would remain as a nominal defendant), and reserving all claims against the PCF. Additionally, the PCF was deemed entitled to a credit of $100,000. A further judgment of dismissal was signed on March 26,2012.
| (¡The matter was tried before a jury on June 18, 2014. Mrs. Johnson and three of her daughters, testified at trial. Stipulations were entered as to the testimony of the other seven children. (Among other things, the stipulations provided that two daughters who lived out-of-state and two sons who were incarcerated were unable to be present during much of their father’s last illness.) All three of the MRP doctors testified in conformity with the opinions they expressed in their written opinion. Dr. Teagle and Dr. Webb testified on behalf of the appellants. In addition to Dr. Herbert, the PCF called Dr. Robert Hernandez, who testified as an expert witness in internal medicine. Dr. Hernandez agreed with Dr. Herbert that Mr. Johnson appeared to have recovered from the consequences of. the failure to reinsert the catheter (UTI, sepsis and septic shock) back to his “baseline” by the time he was discharged to Leslie Lakes. However, he disagreed with Dr. Herbert’s opinion that the nursing home committed no breach of the standard of care.
The jury awarded $100,000 in damages for Mr. Johnson’s physical pain and suffering, 'mental anguish and distress, and loss of quality of life, and$75,000 to Mrs. Johnson for the loss of her husband’s love, affection and companionship. However, the jury awarded no damages to any of the children and no recovery for medical ex *701 penses. Judgment was signed August 7, 2014; it noted that the $100,000 general damages award was,subject to a credit of $100,000. The judgment granted legal interest from the date of filing of the original claim, i.e., April 8, 2009, and ;all costs.
I nThe plaintiffs filed a motion for JNOV as to Mr. Johnson’s medical bills. They also filed a motion for devolutive appeal, claiming that, the general damages of $100,000 awarded for Mr. Johnson’s pain and suffering were insufficient and that the jury erred in denying the children’s claims. .On August 26, 2014, Ms. Redding filed a motion for summary JNOV on. the medical bills. She also filed a motion for devolutive appeal for the same reasons as the plaintiffs.- The PCF opposed the motions for JNOV, asserting that the evidence supported the jury’s 'findings. -On October 16, 2014, the trial court granted JNOV. Judgment was signed on November 3, 2014, awarding Mrs. Johnson $127,988.68 for the medical bills, with legal interest thereon from the date of the filing of the original claim .until paid and all costs of the proceedings.
On its own behalf and on' behalf of the nursing home as the nominal defendant; the POF' filed a motion for suspensive appeal from both the August 7 and November 3,2014, judgments.
GENERAL DAMAGES

Standard of Review,

The appellants contend that we should apply a de novo -standard of review instead of manifest error because the jury’s verdict has already been determined to be manifestly erroneous by virtue of the trial court’s granting of the JNOV on the-issue of medical bills'. In support of this argument, they cite Jones v. St. Francis Gabrini Hosp., 94-2217 (La.4/10/95), 652 So.2d 1381. In that case, the supreme court found that a combination of factors — the PCF’s incorrect closing, argument; certain language used in otherwise non-errone-ous jury instructions which, together with the PCF’s closing argument, had the potential to mislead the jury; and the jury’s internally inconsistent verdict — led to the conclusion that no weight should be accorded to the jury verdict and that a de novo review was proper. However, no JNOV was. granted in that case on any issue.
. The PCF argues that' Jones is distinguishable from the instant , case and that the usual appellate standard of review of manifest error is applicable. Specifically, it maintains that — unlike Jones — there were no issues with the closing argument or the jury instructions which might have misled the jury.
In some instances,'a jury’s verdict is so internally inconsistent as to constitute an abuse of discretion and legal error and thus warrants tide, novo review. See Green v. K-Mart Corp., 2003-2495 (La.5/25/04), 874 So.2d 838, where a jury awarded special damages but denied general damages, and Lewis v. State Farm, Ins. Co:, 41,527 (La.App.2d Cir.12/27/06), 946 So.2d 708, where the damages awarded for two plaintiffs injured in an auto accident were bizarrely irreconcilable, i.e., past mental anguish" to one plaintiff and future medical anguish' for the other. However, our review of this record, fails to reveal such inconsistencies that a de novo review is required on the issues of géneral damages.

Surviml Action Damages

The appellants appeal from the jury award of only $100,000 in damages to Mr. Johnson for his pain, and suffering. They contend that the award is woefully inadequate and should be raised to $300,000.
*702 |sWhen the nursing home settled and paid its $100,000 under La. R.S. 40:1299.44(C)(5)(e), that payment established proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice. At the trial against the PCF, the appellants had the burden of proving that the admitted malpractice caused damages in excess of $100,000. Graham v. Willis-Knighton Med. Ctr., 97-0188 (La.9/9/97), 699 So.2d 365; Khammash v. Clark, 2013-1564 (La.5/7/14), 145 So,3d 246.
In the determination of general damages, much discretion is vested in the trier of fact. La. C.C. art. 2324.1., An appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Farmer v. Willis-Knighton Med. Ctr., 47,530 (La.App.2d Cir.11/14/12), 109 So.3d 15, amended on reh’g (1/10/13), writs denied, 2012-2698 (La.2/8/13), 108 So.3d 89, and 2013-0346 (La.4/1/13), 110 So.3d 586.
In addition, only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. The proper procedure for examining whether, an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which treasonably could have been made by the trier of fact. Farmer v. Willis-Knighton Med. Ctr., supra.
Survival damages may be awarded for the pre-death mental and physical pain and suffering of the deceased. In determining survival damages, the factfinder should consider the severity and duration of any pain or any pre-impact fear-experienced by the deceased, and any other damages sustained by the deceased up to the moment of death.. Simmons v. Christus Schumpert Med. Ctr., 45,908 (La.App.2d Cir.6/15/11), 71. So.3d 407, writs denied, 2011-1592 (La.10/7/11), 71 So.3d 317, and 2011-1591 (La.10/7/11), 71 So.3d 318. Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear or mental anguish during an ordeal leading to the death is compensable. Simmons v. Chris-tus Schumpert Med. Ctr., supra.
Of- the four doctors who testified, only Dr. Herbert inexplicably refused to admit that the nursing home’s failure to reinsert the catheter constituted a breach of the standard of care. Stating that “negligence may be:a strong word,” he downplayed the nursing home staffs conduct, declaring that “there was clearly not an ideal situation.” In order to have made, any award to Mr. Johnson, the jury as trier of fact must have rejected Dr. Herbert’s opinion and accepted.the opinions of the other doctors that the nursing home’s actions were, in fact, a breach of the standard of care,
The majority of the doctors agreed that Mr. Johnson would have been in excruciating pain from thé urinary retention, which lasted four days from the removal of the catheter to its reinsertion in the emergency room. | ^Thereafter, he spent four days in ICU before being transferred to another hospital for an additional three weeks. He was then released , to a different nurs *703 ing home, where he remained for only a few days before going to yet another hospital, where he ■ died 10 days later on Christmas Day. ■
Drs. Teagle and Webb opined that thé nursing home’s substandard care was a substantial contributing factor in Mr. Johnson’s death.' Dr. Teagle stated that, as a result of the hursing home’s failure to replace the catheter, a continuous medical problem existed that ultimately progressed to the point where Mr. Johnson’s body could no longer overcome the effects of the original UTI, and he died. • Dr. Webb noted that, while at Cabrini and Dubuis, Mr. Johnson was diagnosed with severe C. dif-ficile colitis after receiving antibiotic therapy for the UTI and sepsis, and this condition caused severe diarrhea.' He agreed that, more probably than not, it was caused by'the antibiotic-therapy required due to the nursing home’s negligence. He stated that sepsis weakens the body’s system and allowed previously under-control conditions to spiral out of control. According to Dr. Webb, Mr. Johnson was also suffering from anemia during his hospitalization, which required blood transfusions, and that it was most likely related to his underlying gastritis which was, in turn, due to his severely debilitated state caused by the sepsis and septic shock. Dr. Webb concluded that when this “package of circumstances” .came together, it created an ongoing cascade of events which ultimately led to Mr. Johnson’s death. However, he candidly-admitted that, due to his comor-bidities, Mr. 111 Johnson’s chances were “very low for surviving beyond.a year or two, at best,” and that he “was going to die really soon anyway.”
While Dr. Hernandez did not believe that the catheter incident caused Mr. Johnson’s death, he could not agree with Dr. Herbert that there was no breach of the standard of care by the nursing home. He agreed with the other two doctors that the nursing home’s malpractice caused Mr. Johnson to suffer excruciating pain and led to the septic shock that placed'him in the ICU at Cabrini. He stated that, more probably than not, • the malpractice was a contributing factor to Mr. Jbhnson’s renal failure, but not to his death. He opined that death was caused by combination of Mr. Johnson’s comorbid conditions. He agreed with Dr. Webb that a patient with Mr. Johnson’s complications was not going to Uve very long.
Based upon the fact that the jury made an award to Mrs. Johnson, it is obvious that the jury accepted the testimony of Drs. Teagle and Webb that the nursing home’s negligence was a substantial contributing factor to his death. However, there was testimony from Drs. Webb and Hernandez that Mr. Johnson, an elderly and medically complicated patient, had only a year or two of life left, even without the malpractice. In light of Mr. Johnson’s poor health and expected life expectancy, we are unable to find that the award of $100,000 is abusively low, as claimed by the appellants.
Based upon the foregoing, we affirm the jury’s damage award of $100,000 for Mr. Johnson’s pain and suffering.

_J¿¡Damage Awards to Children

Mr. Johnson’s children appeal the jury’s denial of damages to them for the loss of their father.
La. C.C. art. 2315(B) authorizes the recovery of loss of consortium, service, and society as damages by the spouse and children of an injured person. These elements of damages include such pecuniary elements as loss of material services and support and such nonpecuniary components as loss of love, companionship, affection, aid and assistance, society, sexual relations, - comfort, solace, and felicity. *704 Jenkins v. State, Dept. of Transp. & Dev., 2006-1804 (La.App. 1st Cir.8/19/08), 998 So.2d 749, writ, denied, 2008-2471 (La.12/19/08), 996 So.2d 1.133. The , elements of a child’s claim for loss of service and society are essentially the same- as those of the injured person’s spouse without, of course, the.,sexual component of spousal consortium. Simmons v. Christus Schumpert Med. Ctr., supra.
An appellate court may award damages when the trial court initially denies the plaintiffs demands and the record contains sufficient proof of damages. Beckham v. St. Paul Fire & Marine. Ins, Co., 614 So.2d 760 (La.App.2d Cir.1993); Smith v. Safeway Ins. Co. of La., 49,136 (La.App.2d Cir.8/13/14), 146 So.3d 944. In making, an initial award of damages at the appellate level, we are not limited to an award cf either the lowest or highest amount we would affirm. Hammons v. City of Tallulah, 30,091 (La.App.2d Cir.12/10/97), 705 So.2d 276, writs denied, 98-0407 (La.3/27/98), 716 So.2d 892, and 98-0440 (La.3/27/98), 716 So.2d 894. In making an initial award of damages at the appellate level, we set the award in .an amount which is reasonable compensation for the damages shown by the record. Beckham, supra; Smith, supra.
The uncontradicted testimony established that Mr. Johnson enjoyed a close aiid loving relationship 'with all of his children. When Mr. Johnson entered the nursing home, he and his wife had been married for more than 63 years. He had been employed as a sawmill worker his entire life while he and his wife reared their children. Some of the adult children continued to live near their parents.[4] Pictures of family gatherings .and .special events were introduced into evidence. The record indicates that the children visited and communicated with their father as often as their locations and schedules allowed. They lost their father on Christmas Day after enduring the chain of events that unfolded after the initial hospitalization beginning on November 15, 2008. We find that the jury was manifestly erroneous in denying their claims for loss of consortium.
However,- we recognize- that Mr. Johnson was in declining health and in the waning years of his-life. Due to his many maladies,- several of the doctors indicated that it was unlikely that he would have lived more than another year or two, even if his condition had not been compromised by the nursing home’s negligence. The children were deprived of treasuring the time they had left with -their father, who did not have a peaceful transition. Consequently, we find that each of the children is entitled to an-award of $15,000 for his or her loss of consortium.
JjJNOV ON MEDICAL BILLS
The POP appeals from the JNOV granted by the trial court on the issue of Mr. Johnson’s medical bills.
A JNOV is warranted when the facts and inferences, viewed in the light most favorable to the party opposing the motion, are so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. *705 Peterson v. Gibraltar Sav. & Loan, 98-1601 (La.5/18/99), 733 So.2d 1198; Fanguy v. Patwardhan, 48,773 (La.App.2d Cir.4/9/14), 136 So.3d 998. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men, in the exercise of impartial judgment, might reach different conclusions, the motion.should be denied. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829 (La.1991); Fanguy, supra. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Anderson supya.,
In reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. Cashkey v. Merrick Const. Co., Inc., 46,886 (La.App.2d Cir.3/14/12), 86 Solid 186, writ denied, 2012-0847 (La.6/1/12), 90 So.3d 442. The appellate court uses the same criteria as the trial court to determine if the trial court properly granted a JNOV, i.e., h,-do the facts and inferences point so strongly and overwhelmingly in-favor of the moving party that reasonable persons could not arrive at a contrary verdict? Caskey, supra. If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach'a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Anderson, supra; LeBlanc v. Islam, 49,530 (La.App.2d Cir.4/9/15), 164 So.3d, 281, writ denied, 2015-0857 (La.6/5/15), 171 So.3d 951.
Special damages are those damages that can be determined with some degree of certainty and include past and future medical expenses. Thibeaux v. Trotter, 2004-482 (La.App. 3d Cir.9/29/04), 883 So.2d 1128, writ denied, 2004-2692 (La.2/18/05), 896 So.2d 31; Richardson v. Christus Shumpert Health Sys,, 47,776 (La.App.2d Cir.2/27/13), 110 So.3d 264, unit denied, 2013-0621 (La.4/19/13), 112 So.3d 228. The plaintiff bears the burden of proving special damages by a preponderance of the evidence. Richardson, supra.
The negligence of the nursing home staff directly led to Mr. Johnson’s urgent hospitalization on November 16, 2008, with serious medical conditions and required his treatment in three different hospitals. The facts- and inferences point so strongly and overwhelmingly in favor of the appellants that reasonable persons could not arrive at a contrary verdict on the issue of their entitlement to the medical bills for these hospitalizations. .
liflThe PCF contends that he returned to his “baseline” before he was discharged to Leslie Lakes and that no recovery should be allowed for the later Miriden Medical Center 'bills. This argument does not take into consideration the draining effect that the cascading consequences — from urinary retention to UTI to sepsis to septic shock — undoubtedly had on this elderly and medically fragile man’s overall condition.[5] This record fully supports the appellants’ contention that the nursing home’s negligence shortened Mr. Johnson’s life — a point with which the jury obviously agreed when it awarded wrongful death damages in favor of Mr.‘Johnson’s widow. Like the trial court, we also find that the facts and inferences point so strongly, and overwhelmingly in favor of the appellants that reasonable persons *706 could not arrive at a contrary verdict as to the Minden Medical Center bills.
We affirm the trial court’s decision insofar as it found that all of these medical bills were attributable to the negligence of the nursing home and therefore recoverable. However, we remand the matter for a determination of the amounts actually owed. The record indicates that Mr. Johnson was a recipient of both Medicaid and Medicare. As to Medicaid, the appellants are entitled under the law to recover only the portion paid by Medicaid, not the portions “contractually adjusted” or “written off’ by a" healthcare provider pursuant to the requirements of the Medicaid program. Bozeman v. State, 2003-1016 (La.7/2/04), 879 So.2d 692; Finister v. State ex rel. DOTD, 2004-0194 (La.11/24/04), 888 So.2d 214; Bellard v. American Cent. Ins. Co., 2007-1335 (La.4/18/08), 980 So.2d 654. However, pursuant to the collateral source rule, the appellants’ recovery would not be reduced by the amount of the medical expenses paid by Medicare or private insurance benefits; they would be entitled to recover the full values of the medical services, including the. “write-off’ amounts. Bozeman, supra. From the present record, we are unable to make a full determination of those amounts. We note that during the trial,, out of the presence of the.jury, there was an extensiye discussion between opposing counsel and the trial judge pertaining to the medical bills. It appears to us from the transcript that the trial judge recognized that, at some point, there would have to be some adjustments made to the medical expenses that would be recoverable under our law. The PCF did introduce into evidence a Medicaid lien letter which demonstrated the existence of a lien, but. this does not answer the issue to be resolved under the Bozeman case. Unfortunately, neither side addressed any such issues during the hearing on the motion for JNOV. In order to be legally correct on the amount that the appellants are entitled to recover, the matter needs to be resolved on remand. The lower court will need to make a determination of what portion of the $127,988.68 in medical bills is not recoverable under Bozeman. ■
Furthermore, we direct that Ms. Red-ding’s complaint on appeal that the judgment should not have been solely in her mother’s favor shall be addressed on remand.
J^DATE FOR JUDICIAL INTEREST
The PCF claims that the trial court erred in awarding judicial interest from April 8, 2009, the purported date of the original filing of the plaintiffs’ claims with the PCF. It maintains that the plaintiffs did not adequately prove that date and, consequently, judicial interest should only run from September 14,- 2011, the date suit was filed in the district court.
In support of its argument, the PCF contends that thé trial court erred in admitting Ms. Redding’s original complaint letter to the MRP, dated April 8,2009, and her amended complaint dated May 11, 2009. When the exhibits • were initially offered, PCF counsel stated, “I think we can agree on the date. We would object to the filing.” Consequently, the exhibits were simply identified at that point. Later, the parties failed to enter a stipulation on the date' and the PCF renewed its objection. However, the court overruled the objection and admitted the letters into evidence.
Our review of the record reveals that there is no serious question as to the date the claim was filed. Ms. Redding’s original complaint letter to the MRP shows a date of April 8, 2009, and her amended complaint is dated May 11, 2009. The earliest date of the MRP members’ nota-, rized oaths was July 31, 2009. The MRP *707 convened in March 2011 and issued its written opinion in April 2011. The MRP opinion itself recited the date for the filing of the original claim as April 8, 2009. In its opposition to the petition for authority to settle with reservation of rights — the PCF’s first appearance in this suit — the PCF admitted paragraph 17 of the plaintiffs’ petition, which asserted that the matter was submitted to a MRP, and paragraph two of the | ^appellants’- supplemental petition for authority to settle with reservation of rights, which alleged that the plaintiffs instituted the matter by filing a claim pursuant to the LMMA. The PCF also admitted paragraph 3 of the plaintiffs’ petition, which alleged that the PCF confirmed by a letter dated May 22, 2009 (which was six weeks after the date of the original complaint and only 11 days after the date of the amended complaint), that the nursing home was a qualified health care provider and was' insured by the Louisiana Nursing Home Association.
Based on the record before us, we find that the appellants adequately proved the date of filing for the original complaint. Accordingly, the trial court did not err in assessing interest from that date.
CONCLUSION
We affirm the jury’s award of $100,000 in survival action damages for Mr. Johnson. We reverse the jury’s dénial of damages to Mr. Johnson’s children and award $15,000 to each child. We affirm the trial court’s assessment of interest from the date of the filing of the claim, April 8, 2009. We affirm the granting of JNOV on the issue of the medical bills, but remand that issue to the trial court for a determination of the proper amounts.
Costs are assessed to the PCF.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. On appeal, no one questions the $75,000 damage award to the decedent’s widow.

. Eight of these children — Glory J, Lai’d, Thomas H. Johnson, Charles W. Johnson, Toni Calloway, Shirley J, Egan, Melba Taylor, Mary Lard, and Vernell Head- — were born of his marriage with Mrs. Johnson. Patricia Williams was Mr. Johnson's daughter from another relationship.

. Although Ms. Redding initially hired tho same attorney as her mother and siblings, she terminated him after the MRP opinion was rendered. She acted as her own counsel at trial. In this appeal, she appears in proper person and filed her own brief.
When her interests align with those of -the plaintiffs, we will refer to them in the opinion collectively as "the appellants.”

. In October 2008, Mr. Johnson went home from the nursing home for a weekend visit. His family was exploring the possibility of caring for him at home with two of his daughters — -one of whom lived next door and the other across the street — as his main caregivers.

. A defendant takes his victim as he finds him and is responsible for all natural and proba-; ble consequences of his tortious conduct. Caskey, supra.