BLEICH, J„ Ad Hoc.
| plaintiffs, the children of the deceased Justin Roark, Sr,, appeal the awards of damages in this survival and wrongful death action. For the reasons stated herein, we vacate the awards and render.
PROCEDURAL BACKGROUND
This began as a medical malpractice action in which liability and causation for the death of Justin Roark, Sr., were determined on summary judgment and no appeal was taken by the defendants. Thus, the only issue before the court is review of the trial court’s award of damages. The' trial judge awarded $40,000 on the survival action and $30,000 in wrongful death damages to each of the plaintiffs, Mr. Roark’s two children.[1] Plaintiffs appeal, urging that the awards are abusively low.
FACTS
The Roarks were married in 1994 and had two children, Justin Dean Roark, Jr., and Shelby Sue Roark, who were both born in 1995, 10 months apart. The only indication in the record is that the marriage was happy and ‘the family was close until the parties “grew apart” arid divorced in 2000. There is no evidence in this record of any animosity between the Roarks and the parents were agreeable and cooperative, ie., not acrimonious, during the divorce and custody proceedings.
The Roarks enjoyed joint custody, with Mr. Roark having visitation every other weekend. Mr. Roark consistently paid child support in an amount agreed upon by the .parties. When Mr. Roark was between jobs, he Ufell behind in child support, but eventually became current again. Ms. Roark testified that Mr. Roark always endeavored to support Dean and Shelby.
*174 In September 2001, Ms. Roark and the children, who were five and six years old at the time, moved to Connecticut, where Ms. Roark’s family was located. Ms. Roark testified that she moved because she lost her job and that, although he was unhappy with the move, Mr. Roark understood her reasoning and agreed that the move was appropriate. According to Ms. Roark, she and Mr. Roark agreed that he would enjoy full summer visitation and would bear the children’s travel expenses in lieu of paying monthly child support. Both parties agree that Mr. Roark maintained contact with the children by telephone and sent gifts on holidays and special occasions. Dean spent the first summer with his father (Shelby was too young to fly unattended). Both children spent the summers of 2002, 2003 and 2004 with their father.
In 2004, after the final summer visit, Mr. Roark suffered an offshore head and neck injury. He was hospitalized and, thereafter, treated outpatient for physical and mental injuries. After the accident, Mr. Roark’s contact with the children tapered off and, apparently, he began experiencing the onset of adult schizophrenia and bipolar disorder. Mr. Roark did not tell Ms. Roark and the children; he did not want them to know of his condition. He was receiving medical care and, in 2007, Mr. Roark’s doctors changed his medications. Following the change in medications, Mr. Roark began having problems and, in August 2007, he was admitted to the nursing home | aowned by Liberty Healthcare in order for his medications to be stabilized and with the intent that he would be released once he was stable.
During his inpatient stay, Mr. Roark developed strep throat type symptoms. He began running fever and complained to the staff of a sore throat and difficulty breathing. On August 24, 2007, the staff gave Mr. Roark Tylenol and advised him to gargle with saltwater. The following morning, at 7:00 a.m., Mr. Roark’s temperature was 102 degrees and his pulse rate was high at 138 beats per minute. During the course of the morning, Mr. Roark repeatedly told the staff that he was very ill and could not breathe well. Midmorning, Mr. Roark asked to go to the emergency room. The LPN on duty, Ms. Stevens, told RN David Allen, who, in turn, called Lois Evans, the nurse practitioner, to ask for instructions. Ms. Evans testified that Nurse Allen did not tell her that Mr. Roark was having difficulty breathing — if she had been aware, of this, she would have instructed that Mr. Roark be taken to the emergency room. Instead, Ms. Evans instructed Nurse Allen to give Mr. Roark an injection of Rocephin STAT (within 15 minutes). Nurse Allen did not give the injection. Some three hours later, Nurse Allen called in the order of Rocephin to the pharmacy. As discussed below, Mr. Roark did not receive the medication until minutes before his death.
The nursing home records reflect that throughout the afternoon, Mr. Roark had hard chills, difficulty breathing and abnormal vital signs. At 2:00 p.m., during a visit from his sister, Mr. Roark complained that the staff would not help him and that he was dying. Mr. Roark walked from his bed 14to the nurses station several times to tell them he could not breathe and needed to go to the emergency room. Specifically, at 4:00 p.m., Mr. Roark went to the nurses station and asked for oxygen and was refused. At 4:45 p.m., he returned to the nurses station again and asked for oxygen and was refused. LPN Stevens observed that he could not breathe well, but attributed it to anxiety and gave him a Xanax. Mr. Roark went back to his room and collapsed. The staff then attempted to administer oxygen, but it was not connected properly so no oxygen was received by *175 Mr. Roark. He fell unconscious and CPR was administered, but Mr. Roark died. A short time before his death, the Rocephin injection was finally administered.
A DHH investigation revealed violations of its standards in many respects.
Dr. Perretti performed an autopsy and determined the cause of death to be suffocation due to swelling of the epiglottis and an excess of pus blocking the breathing passages, both secondary to a bacterial infection. Dr. Perretti testified that the condition can develop suddenly if caused by an allergic reaction, but progresses slower when caused by a bacterial infection such as in Mr. Roark’s ease.
Ms. Roark filed a complaint in medical malpractice and a medical review panel was convened. The panel unanimously found a breach of the standard of care, discrediting the testimony of LPN Stevens and Nurse Allen. The panel concluded that seven hours prior to Mr. Roark’s death he exhibited symptoms that should have been treated with emergent care and hospitalization. Ms. Roark filed a motion for summary judgment on pliability and causation, which was granted by the trial court and from which there was no appeal.
The matter proceeded to trial on quantum alone. In addition to the medical evidence and testimony of Ms. Roark as outlined above, Dean and Shelby testified. Dean was 12 years old when his father died and Shelby was 11. Dean, who was 20 years old at the time of trial, testified that he was too young to remember specific events prior to the move to Connecticut. However, he did recall family trips to Oklahoma and standing up as best man and ring bearer at his father’s marriage to his stepmother, Terri. Dean remembers this special event as an honor and said that it made him feel good to stand at his father’s side. Dean also remembers fishing with his father and grandfather on his grandfather’s pond and working on his father’s truck and Camaro together during his summer visits. He testified that he still works on his car and has fond memories . of learning from his father. Dean described the summer visits as family time, spending time visiting and having “good food.” Dean testified that he loved his father and characterized him as a “nice guy” and “very positive person to be around.” When asked about the time when the summer visits ceased, Dean explained that he understood that his father was unable to afford the expensive airfare for him and Shelby and that is the reason he believed the visits stopped. Dean related that when his mother told him of his father’s death, he “just shut down.” Regarding his father’s absence from his life, Dean lamented not having him around during his little league time and when he played football.
IfiShelby had just recently graduated from high school at the time of trial and was awaiting notification of active duty status in the Navy. She testified that she elected to join the Navy because family members had served and the Navy felt like a family to her. Shelby recalled her mother telling her of her father’s death, stating that she had a hard time believing it. Although the children were financially unable to attend their father’s funeral in Louisiana, a memorial service was held at their church in Connecticut. Shelby testified that she, her mother and Dean planted a butterfly bush.for her father and put a stone underneath the bush. “On holidays and whenever I was thinking about him, I’d write a note, go out there and put it underneath [the] rock.” Shelby still does that from time to time, writing to her father that she misses him and telling him what is happening in her life. She explained that writing the letters makes her feel like she can still talk to her father. *176 She did this as recently as her completion of basic training in the naval academy. Shelby also-testified that she enjoyed the phone calls and gifts from her father when she lived in Connecticut. Shelby enjoyed the fishing and shopping that she did with her father during the summer visits. She testified that she thinks of her father often and misses him very much.
ACTION OF THE TRIAL COURT
The trial judge awarded survival damages in the amount of $40,000; Unlike the medical review panel, the judge credited the testimony of LPN Stevens and Nurse Allen and adopted the “sudden onset” argument. Specifically, the judge found that Mr. Roark should be compensated for his |7suffering during only the 10 to 15 minutes prior to his death, instead of the 'hours preceding his death during which his condition gradually worsened.
■ Regarding wrongful death claims, the trial judge found that, after the summer of 2004, Mr. Roark had no contact with Dean and Shelby and that he provided no financial support after 2007. He also emphasized that the ■ children had bonded- with their mother’s live-in boyfriend and regarded him as their stepfather. Based on what the judge determined to be an estranged relationship with their father, the judge- awarded $30,000 each to Dean and Shelby for the wrongful death of their father.
DISCUSSION

Survival damages

Dean and Shelby appeal the award of only $40,000 in survival damages representing their-father’s suffering preceding his death. They contend that the award is woefully inadequate and erroneously based on the sudden onset theory rather than the hours of suffering endured by Mr. Roark on the day his death. They contend that the award should be raised to $90,000.
In the determination of general damages, much discretion is vested in the trier of fact. La. C.C. art. 2324.1. When the award- is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, the appellate court should increase or reduce the award. Johnson v. CLD, Inc., 50,094 (La.App.2d Cir.9/30/15), 179 So.3d 695, citing Farmer v. Willis Knighton Med. Ctr:, 47,530 (La.App.2d Cir. 11/14/12), 109 So.3d 15, amended on reh’g, (1/10/13), writs denied, 2012-2698 (La.2/8/13), 108 So.3d 89, and 2013-0346 (La.4/1/13), 110 So.3d 586.
In addition, after an abuse of discretion is disclosed by an articulated analysis of the facts, an examination of prior awards in similar eases is proper. An abusively low award should then be raised to fhe lowest amount the trier of fact could have reasonably awarded, while an abusively high award should be reduced to the highest amount the trier of fact could have reasonably awarded. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which reasonably could have been made by the trier of fact. Johnson v. CLD, Inc., supra -, Farmer v. Willis Knighton Med. Ctr., supra.
Survival damages may be awarded for the predeath mental and physical pain and suffering of the .deceased. In determining survival damages, the factfinder should consider the severity and duration of any pain or any predeath fear experienced by the deceased, and any other damages sustained by the deceased *177 up to the moment of deaths Johnson v. CLD, Inc., supra, citing Simmons v. Christus Schumpert Med. Ctr., 45,908 (La. App.2d Cir.6/15/11), 71 So.3d 407, writs denied, 2011-1592 (La.10/7/11), 71 So.3d 317, and 2011-1591 (La.10/7/11), 71 So.3d 318. Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear or mental anguish during an ordeal leading to the death is-compensable. Id.
UWe conclude that the trial judge was clearly wrong in finding1 that Mr. Roark suffered only during the last 15 minutes of his life. The trial judge’s reliance on the testimony of LPN Stevens and Nurse Allen was misplaced in light of the conclusions of the medical review panel and the DHH. The record demonstrates that Mr. Roark suffered increasing pain, difficulty breathing and anxiety beginning in the early morning and escalating during the afternoon hours preceding his collapse and death from suffocation. Mr. Roark knew that something was terribly wrong and repeatedly pleaded with the staff for help, to go to the emergency room and for oxygen. He told his .sister and staff members that he could not breathe and was dying. Mr. Roark was aware of the seriousness of his symptoms and the emergent need for treatment; he not only suffered physically but was understandably terrified that he could not breathe and could not gain assistance.
In addition, the opinion of the medical review panel was that Mr. Roark suffered for hours leading up to his eventual suffocation. Dr. Perretti . corroborated the medical review panel’s opinion. He testified that Mr. Roark’s condition was caused by a viral infection which turned bacterial in nature. The bacterial infection caused the swelling and pus accumulation which caused Mr. Roark’s throat to gradually close over the three-days prior to his death, resulting in suffocation. ■
We conclude that the trial court abused its discretion and the award of $40,000 for' hours of physical and mental suffering- is abusively low. Under the circumstances of this case, we find the lowest reasonable award for the suffering of Mr. Roark for the hours preceding- his death to be $75,000. See Barthel v. State, Dept. of Transp. and Dev., 2004-1619 (La.App. 1st Cir.6/10/05), 917 So.2d 15, ($50,000 for some minutes of suffering); Farmer v. Willis Knighton Med. Ctr., supra, ($250,-000 award for nearly three hours of pain and suffering); Simmons v. Christus Schumpert.Med. Ctr. ($100,000 where decedent died a week post-surgery and on the day of her death the decedent recognized that her respiratory condition was deteriorating and the nursing staff failed to recognize). • ■ ■

Wrongful death damages

Dean and Shelby argue that the trial judge manifestly erred in finding that their relationship with their father had virtually ceased to exist after the last summer visit and that the relationship with their mother’s boyfriend supplanted that of their father. They emphasize that they had a close, .loving relationship with their father and that the only reason their communication ceased with their father was due to his mental illness, of which they were unaware. Dean and Shelby seek an increase in the wrongful .death awards to $100,000 each.
In a wrongful death action involving allegatiofis of medical malpractice, a plaintiff may establish a compensable claim through evidence which demonstrates that a defendant’s medical malpractice resulted in' the loss of a chance of survival of a patient who thereafter, expired. Farmer v. Willis Knighton Med. Ctr., supra. The wrongful death action *178 compensates the beneficiaries for their own injuries which they suffer from the moment of the victim’s death and thereafter. Warren v. Louisiana Medical Mut. Ins. In Co., 2007-0492 (La.12/2/08), 21 So.3d 186; Taylor v. Giddens, 618 So.2d 834 (La.1993).
The elements of damages for a wrongful death action are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Smith v. Louisiana Farm Bureau Cas. & Ins. Co., 45,013 (La.App.2d Cir.4/23/10), 35 So.3d 463, writ denied, 10-1205 (La.9/17/10), 45 So.3d 1052. Wrongful death awards may be based on the degree of affection with the deceased, the amount of guidance needed by the minor, and the closeness of the family relationship. Sledge v. Continental Casualty Co., 639 So.2d 805 (La.App. 2d Cir.1994). In making this evaluation, the court may consider custody arrangements resulting from a divorce or separation of the child’s parents. Id.
The record does not reasonably support the finding that Mr. Roark had an estranged relationship warranting minimal wrongful death damage awards. The testimony reveals that Mr. Roark was a loving, conscientious and devoted father who paid the agreed upon child support when able and maintained consistent contact with Dean and Shelby until such time as he was mentally incapable of doing so. The uncontradicted evidence at trial painted a healthy and rewarding relationship between Mr. Roark and Dean and Shelby, including summer fishing, working on cars and a focus on family. The children clearly loved and revered their father; Dean was honored to stand as Mr. Roark’s best man and Shelby continues to write letters to her father to this day as a way to feel connected to him.
112The lapse in financial support and temporary break in communication, which was beyond the control of Mr. Roark and the children, should not operate to reduce an award for wrongful death where the children remained loyal and loving to their father and suffered great loss on his passing. As Dean and Shelby note, had Mr. Roark not met such an unfortunate and untimely death, he would likely have been stabilized and discharged. There is absolutely no indication in this record that his relationship with his children was permanently broken or scarred in any way. Indeed, the goal of Mr. Roark’s admission to the nursing home was stabilization and release and he advised the staff at intake that his only regret was that he was not able to see his children. On this record, we find that the award to the children of $30,000 each was abusively low. After a review of similar cases, we find that the lowest reasonable award for each child is $75,000. See Johnson v. Foti, 02-1995 (La.App. 4th Cir.4/9/03), 844 So.2d 1050 ($85,000 to daughter of deceased father who was incarcerated when he died; daughter saw father on weekends prior to his incarceration and received cards and gifts from him); Street v. Louisiana Pacific Corp., 36,352 (La.App.2d Cir.9/18/02), 829 So.2d 450 ($100,000 to four major children who did not reside with the decedent); Sledge v. Continental Casualty Co., supra, ($150,-000 highest reasonable award for 11-year-old child of divorced father who was deceased).
DECREE
For the foregoing reasons, the awards of survival damages and wrongful death damages are vacated and judgment is hereby rendered | ^awarding the plaintiffs $75,000 in survival damages and awarding Justin Dean Roark, Jr., $75,000 in wrongful death damages and awarding Shelby Sue Roark *179 $75,000 in wrongful death damages. Costs are assessed to defendants/appellees.
DAMAGE AWARDS VACATED; JUDGMENT RENDERED.